Angelique **BYRD**, Brent Cuniffe, Janice Dallas, Della Davis, Donald Day, James Dexter, Terri Emsing, Patricia Everly, Sue Hochstetler, Norma Murphy, Thomas Perkins, Mildred Weidenhaupt, and Mark Zollman, Appellants–Defendants,

v.

**AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES, COUNCIL 62 (AFSCME),** Appellee–Plaintiff.

No. 49A02–0202–CV–165.

Court of Appeals of Indiana.

Jan. 14, 2003.

See also 718 N.E.2d 757.

William F. Diehl, Gagnon & Diehl, Indianapolis, IN, Milton L. Chappell, National Right to Work Legal Defense Foundation, Inc., Springfield, VA, Attorneys for Appellants.

Mary Jane Lapointe, Richard J. Darko, Lowe Gray Steele & Darko, LLP, Indianapolis, IN, Attorneys for Appellee.

## OPINION

SULLIVAN, Judge.

Appellants, Angelique Byrd, Brent Cuniffe, Janice Dallas, Della Davis, Donald Day, James Dexter, Terri Emsing, Patricia Everly, Sue Hochstetler, Norma Murphy, Thomas Perkins, Mildred Weidenhaupt, and Mark Zollman (collectively "the Employees") challenge the trial court's grant of summary judgment in favor of the American Federation of State, County, and Municipal Employees, Council 62 ("the Union"), allowing the Union to collect fair share fees from the Employees, who are not members of the Union. In support of their argument that the trial court improperly granted summary judgment, the Employees raise five issues for our appellate review, which we restate as the following four:

I. Whether Executive Order 90–6 prevents the collection of fair share fees from non-union member employees;

II. Whether the fair share provision in the settlement agreement between the State and the Union improperly defines what is chargeable to non-union member employees;

III. Whether the Union failed to comply with the requirements set forth by the United States Supreme Court when it failed to perform an allocation audit; and

IV. Whether the Union met its burden of proof with regard to its entitlement to the fair share fees in question.

We affirm in part, reverse in part, and remand.

On May 22, 1990, then-Governor Evan Bayh promulgated Executive Order 90–6, which laid the groundwork for executive branch state employees to join labor un-

ions. *Nass v. State ex rel. Unity Team,* 718 N.E.2d 757, 760 (Ind.Ct.App.1999), *trans. denied.* The Bayh order created a procedure for the recognition of an employee organization as the exclusive negotiating organization for members of an appropriate employee unit. *Id.* The Bayh order provided that the negotiating organization was entitled to meet and negotiate with the State Personnel Director on matters of wages, hours, and working conditions in an effort to reach a settlement subject to the Governor's approval. *Id.* The Bayh order also required the negotiating organization to represent all employees of the bargaining unit regardless of whether the employee was a member of the organization. *Id.* The language in the order that is the focus of our attention reads, "Employees shall have the right, freely and without fear of penalty or reprisal, to form, join and assist any lawful employee organization, *or to refrain from any such activity.*" Appellant's Appendix at 7 (emphasis supplied).

On August 8, 1997, Governor Frank O'Bannon issued Executive Order 97–29, which approved and implemented a settlement agreement between the State and the Union. This order reads in pertinent part:

> "NOW, THEREFORE, I, FRANK O'BANNON, by virtue of the authority vested in me as the Governor of the State of Indiana, do hereby order that:
> 1. The Settlement with AFSCME/Indiana is hereby approved and incorporated by reference herein.
> 2. The Settlement shall be implemented effective August 8, 1997 and shall be administered in accordance with the laws of this State.
> 3. The Settlement does not supersede any existing of [sic] future statute, promulgated rule or executive order, except those executive orders

which implemented prior settlements between the State and AFSCME/Indiana. State officers and employees subject to the executive authority of the Governor shall administer and construe the Settlement as superseding any conflicting policies and work practices." Appellant's Appendix at 8.

The Settlement which was incorporated into the O'Bannon order contained the following provision:

> "Section E. All employees hired after October 1, 1997 must begin paying to the Union, on January 1, 1998, their fair share of the costs of providing Union representation, in an amount not exceeding eighty-five (85%) of the dues required to be paid by employees who are members of the Union. The amounts required of nonmembers shall not include fees, charges, and assessments involving political contributions. Employees required to pay fair share may make such payments by paycheck withholding.
>
> The Union shall establish and operate a procedure to protect the rights of nonmembers who are required to make fair share payments to such organization, which procedure shall include:
> (1) An annual notice to such nonmembers of the fair share amount they are required to pay, including an audited Union financial statement and a disclosure by the Union of the manner in which it has arrived at the fair share amount;
> (2) An expeditious procedure allowing nonmembers to challenge the Union's calculation before an impartial decision-maker; and
> (3) An escrow fund into which all amounts in dispute shall be placed pending the decision of the impartial decision maker.

All monies collected by the Union pursuant to this provision must be held in escrow until it is determined by a court of general jurisdiction that this fair share provision is lawful. If a court determines that this fair share provision is not lawful, the Union shall return the monies held in escrow plus interest to the affected employees. Moreover, the Union agrees to hold harmless and indemnify the State for any and all expenses, including but not limited to legal fees it incurs in defending any action challenging the legality of this provision or operation of this provision and to pay in full any judgments against the State." Appellant's Appendix at 1.

Thereafter, the Auditor of State refused to honor the voluntary paycheck deductions for fair share fees, and several state employee unions, including AFSCME, joining the Governor as a necessary party under Indiana Trial Rule 19, petitioned the trial court to mandate that the Auditor do so.[1] The unions also sought damages and a request for a declaratory judgment that the fair share provision of the Settlement was lawful and enforceable. The trial court entered summary judgment in favor of the unions, ordering the Auditor to process the voluntary paycheck deductions and declaring that the fair share fee was legal and enforceable. The Auditor appealed, and in *Nass*, another panel of this court held that the Governor did have the authority to enter into settlement agreements with the unions. 718 N.E.2d at 763–64. The *Nass* court also held that the unions and the Auditor did not have sufficient adverse legal interests regarding the fair share provision. *Id.* at 766. Therefore, the *Nass* court reversed the trial court on the issue of the legality and enforceability of the fair share provision contained in the Settlement. *Id.*

Upon remand, AFSCME, on December 11, 2000, sued several non-union state employees, among them the Employees in this case, who refused to pay the fair share fee. The Employees responded and counterclaimed. On April 30, 2001, the Union moved for summary judgment and the Employees filed a response on August 28, 2001, which argued against summary judgment for the Union and in favor of summary judgment for them. On February 1, 2002, the trial court granted summary judgment in favor of the Union. It is from this judgment that the Employees now appeal.

### Summary Judgment

Summary judgment is appropriate only if the designated evidentiary material demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); *Title Search Co., Inc. v. 1st Source Bank*, 765 N.E.2d 167, 171 (Ind.Ct.App.2002), *trans. denied.* Genuine issues of material fact exist where facts are in dispute concerning an issue which would dispose of litigation. *Gen. Housewares Corp. v. Nat'l Sur. Corp.*, 741 N.E.2d 408, 412 (Ind.Ct.App. 2000). Upon appeal, we apply the same standard as the trial court and resolve disputed facts or inferences in favor of the non-moving party. *Title Search*, 765 N.E.2d at 171. This court and the trial court are bound to consider only those matters which were designated to the trial court. *Markley Enters., Inc. v. Grover*, 716 N.E.2d 559, 564 (Ind.Ct.App.1999). The moving party bears the burden of establishing, prima facie, that no genuine issues of material fact exist and that he or

---

**1.** Specifically, the other unions were Unity Team, Local 9212, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW), and American Federation of Teachers (AFT). *Nass*, 718 N.E.2d at 757.

she is entitled to judgment as a matter of law. *Title Search*, 765 N.E.2d at 171. Once the moving party has met this burden, the burden falls upon the non-moving party to set forth specific facts demonstrating a genuine issue for trial. *Id.* The non-moving party may not rest upon his or her pleadings, but must set forth specific facts, using supporting materials contemplated under the rule, which show the existence of a genuine issue for trial. *Brown v. Banta*, 682 N.E.2d 582, 584 (Ind. Ct.App.1997), *trans. denied.* In addition, the party appealing a grant of summary judgment bears the burden of persuading us that the trial court erred. *Title Search*, 765 N.E.2d at 171.

I

*The Executive Orders*

■■■ The Employees argue that the portion of the Bayh order which states that employees shall have the right, freely and without fear of penalty or reprisal, to refrain from joining and assisting any lawful employee organization prohibits the collection of fair share fees in general. Therefore, their argument continues, the fair share provision contained in the Settlement approved and incorporated into

the O'Bannon order is invalid.[2] The Employees do not dispute that a later executive order could overrule or amend a prior executive order. They do, however, claim that the O'Bannon order itself contains language which limits its ability to do so. The O'Bannon order states that the Settlement does not supersede any existing or future statute, promulgated rule, or executive order, except those executive orders which implemented prior settlements between the State and the Union. The Employees argue that the O'Bannon order implementing and incorporating the Settlement cannot, by its own language, supersede the Bayh order which, according to the Employees, prohibits the collection of fair share fees. Thus, the first question becomes whether the Bayh order prohibits the collection of fair share fees as claimed by the Employees. If it does, the question then becomes whether the Bayh order limits the ability of the O'Bannon order to approve a settlement containing a fair share provision.

In arguing that the Bayh order prohibits the collection of fair share fees, the Employees rely upon *Fort Wayne Educ. Ass'n v. Goetz*, 443 N.E.2d 364 (Ind.Ct.App. 1982). In *Goetz*, the teachers union sued to collect fair share fees[3] from non-union

---

**2.** The Union claims that the *Nass* court has already ruled on this issue, and that the Employees' argument is barred by the law of the case doctrine. We disagree. The issue before the *Nass* court was whether the Governor lacked authority to enter into the Settlement with the unions; specifically, that the General Assembly had not authorized the Governor to do so. The *Nass* court held that the executive order implementing the Settlement was a reasonable exercise of the Governor's responsibility for the efficient operation of the executive branch of state government. 718 N.E.2d at 763–64. The *Nass* court specifically declined to address the legality of the fair share fee provision. *Id.* at 766. Therefore, we hold that this issue is not barred from our consideration by the law of the case doctrine.

**3.** The *Goetz* court referred to the provision requiring non-union teachers to pay as an "agency shop" provision. 443 N.E.2d at 368. "An agency shop is defined as requiring, as a condition of employment, nonunion member employees to pay fees to a union for services rendered as their bargaining representative but not otherwise requiring membership." *Id.* Thus, "agency shop" fees and fair share fees are substantially the same. *See id.* at 368 n. 1. *See also Chicago Teachers Union, Local No. 1 v. Hudson*, 475 U.S. 292, 303 n. 10, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986) (noting that, under an agency shop arrangement, a union that acts as exclusive bargaining representative may charge non-union members, who do not have to join the union or pay

teachers. The trial court granted summary judgment in favor of the non-union teachers, and the union appealed. The *Goetz* court stated that individuals have a right of choice not to associate themselves with a particular organization or ideology. *Id.* at 368. The *Goetz* court noted that the then-applicable version of Indiana Code § 20–7.5–1–6(a) provided that school employees had the right to " 'form, join or assist employee organizations.' " *Id.* at 371 (quoting I.C. § 20–7.5–1–6(a)). The *Goetz* court wrote, "Conspicuously absent is any statutory right to refrain from 'assisting' or 'participating' in a labor organization. Statutory phraseology such as this was the foundation for quashing agency shop provisions in some situations." *Id.* at 371. The *Goetz* court then cited several cases from other states [4] which had relied upon such "right to work" language in holding fair share fees invalid.[5] The *Goetz* court stated that I.C. § 20–7.5–1–6(a) did not contain such restrictive "right to work" language, and held that the teachers union could collect the fair-share fee. 443 N.E.2d at 371.

In the present case, the Employees claim that the language contained in the Bayh order, stating that state employees have a right to refrain from such activities as "assisting" employee organizations, is exactly the sort of language which the *Goetz* court noted as being absent in that case. We recognize that the language in the Bayh order is similar to that found in the California, New Jersey, and New York cases cited by the *Goetz* court. However, we find instructive the provisions of Indiana's former right to work statute,[6] which was repealed in 1965. *See* Acts 1965, Chapter 1 § 1; *Goetz,* 443 N.E.2d at 371. As quoted by the *Goetz* court, this statute provided among other things, " 'the right to refrain from forming, joining, continuing membership in, or assisting labor organizations.' " 443 N.E.2d at 371.

Despite this language, the court in *Meade Elec. Co. v. Hagberg,* 129 Ind.App. 631, 159 N.E.2d 408 (1959), held that the right to work statute did not itself ban an agency shop, i.e., fair share, agreements. The *Meade* court held that the right to work statute was "plain and unambiguous, and there is no prohibition against the requirement of the payment of fees or charges to a labor organization. The Indiana law merely prohibits agreements and conduct which conditions employment on membership in a labor organization." 129 Ind.App. at 641, 159 N.E.2d at 413. The court further held that:

> "it would seem that the clear, unequivocal language of the Indiana act was intended to apply to union membership and not to outlaw 'agency shop' agree-

union dues, a fee for acting as their bargaining representative).

4. The cases cited by the *Goetz* court were *City of Hayward v. United Public Employees,* 54 Cal.App.3d 761, 126 Cal.Rptr. 710 (1976) (relying upon a statute which forbade participation in unions as well as upholding the right to individually represent oneself), *New Jersey Tpk. Employees' Union v. New Jersey Tpk. Auth.,* 117 N.J.Super. 349, 284 A.2d 566 (1971) (relying upon a right to refrain from assisting the union), *aff'd,* 123 N.J.Super. 461, 303 A.2d 599 (1973), *aff'd,* 64 N.J. 579, 319 A.2d 224 (1974), and *Farrigan v. Helsby,* 42 A.D.2d 265, 346 N.Y.S.2d 39 (1973) (relying

upon a statutory right to refrain from assisting the union).

5. As noted by the court in *Wessel v. City of Albuquerque,* 299 F.3d 1186, 1191 (10th Cir. 2002), in both *City of Hayward,* and *New Jersey Tpk. Employees' Union,* the courts also relied upon the fact that the alleged fair share fee in question was equal in amount to the dues paid by union members in holding the fees invalid.

6. Burns' Ann. §§ 40–2701 through 40–2706 (Supp.1964).

ments which provide for the payment of fees and dues to labor organizations properly designated as collective bargaining representatives. Had the legislature intended to make such [agency shop] provisions and such conduct illegal it should have so expressly declared in the language of the act." 129 Ind.App. at 642, 159 N.E.2d at 414.

Similarly, the Bayh order could have, but did not explicitly prohibit the payment of fair share fees. Instead, it simply says that employees have the right to refrain from assisting the Union. Since the *Goetz* opinion was issued, the General Assembly in 1995 amended I.C. § 20–7.5–1–6(a) to include the following language:

"A school employee may not be required to join or financially support through the payment of *fair share fees,* representation fees, professional fees, or other fees, a school employee organization. A rule, regulation, or contract provision requiring financial support from a school employee to a school employee organization is void." (Burns Code Ed. Repl.1997) (emphasis supplied).

Such language clearly forbids the collection of fair share fees, or any other fees, from school employees to support a union.[7] In contrast, the Bayh order merely grants state employees the right to refrain from "assisting" the Union. Properly determined fair share fees do not require the Employees to "assist" the Union; the fair share fees assist the Employees themselves, whom the Union is required to represent as the sole representative of state employees. By paying a properly determined fair share fee, the Employees are simply required to pay precisely their

fair share and not be "free riders." *See Goetz,* 443 N.E.2d at 369 (rationale behind agency shop agreements is the elimination of "free riders," i.e., those nonmembers who partake of the benefits engendered by their labor representatives without paying their share of the costs associated therewith).

As we have determined that the payment of fair share fees does not amount to assisting the Union, the fair share provision in the Settlement incorporated by the O'Bannon order does not run afoul of the right-to-refrain provision of the Bayh order. *See Wessel v. City of Albuquerque,* 299 F.3d 1186, 1191 (10th Cir.2002) (when viewed in context of public policy interest of allowing fair share fees, ordinance stating that city employees had the right to refuse to join and participate in activities of employee organizations and did not specifically address fair share fees did not necessarily prohibit such fees). Therefore, we need not consider whether the O'Bannon order supersedes the Bayh order, as the two are not in conflict. *See id.* at n. 1. In sum, the Bayh order does not forbid the collection of fair share fees.

## II

### *Definition of Chargeable Expenses*

■ The brunt of the Employees' argument relates to the issue of whether the Bayh order prohibits the collection of fair share fees per se. Still, they also argue that, even if fair share fees in general are permissible under the Bayh order, the Settlement improperly defines what non-union employees may be charged for,[8] and thus,

---

7. The amendment by its own terms is restricted to school employees. It does not purport to cover State government employees.

8. Union expenses which are properly included in the amount which non-union employees

are required to pay are referred to as "chargeable" expenses; those expenses which are not properly included are termed "nonchargeable."

the trial court erred in granting summary judgment in favor of the Union. The Settlement approved by the Governor and incorporated into his order includes the following provision:

"All employees hired after October 1, 1997 must begin paying to the Union, on January 1, 1998, their fair share of the costs of providing Union representation, in an amount not exceeding eighty-five (85%) of the dues required to be paid by employees who are members of the Union. *The amounts required of nonmembers shall not include fees, charges, and assessments involving political contributions.* Employees required to pay fair share may make such payments by paycheck withholding." Appellant's Appendix at 1 (emphasis supplied).

The Employees claim that the emphasized language means that the fair share fees may be used in any manner by the Union, subject only to the restriction that they not be used for "political contributions." The Employees note that as a matter of law the restrictions placed upon the use of fair share fees are considerably broader than merely a prohibition against use as political contributions.

▮ In *Lehnert v. Ferris Faculty Ass'n,* 500 U.S. 507, 111 S.Ct. 1950, 114 L.Ed.2d 572 (1991), the United States Supreme Court set forth three guidelines for determining on a case-by-case basis what expenses a union may charge to non-members without impinging upon the non-members' First Amendment rights. *See also Albro v. Indianapolis Educ. Ass'n,* 585 N.E.2d 666, 672 (Ind.Ct.App.1992), *trans. granted, opinion adopted by Fort Wayne Educ. Ass'n v. Aldrich,* 594 N.E.2d 781 (Ind.1992). Chargeable union expenses must be for: (1) activities which

are "germane" to collective bargaining, (2) activities which are justified by the government's vital policy interest in labor peace and avoiding "free riders," and (3) activities which do not significantly add to the burdening of free speech that is inherent in allowing an agency or union shop. *Albro,* 585 N.E.2d at 671 (citing *Lehnert,* 500 U.S. at 519, 111 S.Ct. 1950). Using the *Lehnert* standard, the *Albro* court held that the union could not, as part of the fair share fee, charge the non-member teachers for: lobbying expenses unrelated to the unit's collective bargaining agreement; electoral political expenses or charitable contributions, even if de minimis; public relations expenses; extra-unit litigation expenses; organizational activities; and members-only benefits. *Albro,* 585 N.E.2d at 671–74.

Here, the Employees argue that any of these non-chargeable expenses, save "political contributions," are permissible under the terms of the Settlement, and therefore, the terms of the Settlement would allow for unconstitutional charges to be included in the fair share fee. Citing *Ford v. Madison–Grant Teachers Ass'n,* 675 N.E.2d 734 (Ind.Ct.App.1997), *trans. denied,* the Employees claim that this infirmity vitiates the fair share provision. In *Ford,* the school board and the union, which was the exclusive bargaining representative for all teachers, including non-members, had negotiated a master contract. This master contract contained a provision that stated that all members of the bargaining unit, including non-union member teachers, had an obligation to pay a fair share fee to the union in an amount equal to the union's membership dues.[9] The master contract also stated that this fee could be paid through payroll deduc-

---

**9.** The contract at issue in *Ford* covered the 1992–93 school year, and was thus unaffected by the 1995 amendments to I.C. § 20–7.5–1– 6(a) which prohibits fair share fees in school employee contracts. *See* 675 N.E.2d at 737.

tions, but that those who refused to authorize payroll deductions nevertheless had a continuing and enforceable obligation to pay the fees directly to the union. The master contract in *Ford* also contained the following rebate provision:

"The [union] recognizes that no member of the bargaining unit should be forced to contribute financial support to political or ideological activities, or other activities, that are unrelated to its duties as exclusive bargaining representative. Consequently, *the* [Union] *agrees to adopt an internal . . . remedy providing for a pro rate [sic] refund of the Fair share fee to persons who so request."* 675 N.E.2d at 736.

The union sued the non-member teachers to collect the fee called for in the master contract. When the trial court denied the non-members' motion for summary judgment and instead granted summary judgment in favor of the union, the non-member teachers appealed.

The *Ford* court noted that the United States Supreme Court had rejected claims that it is unconstitutional for a public employer to designate a union as the exclusive collective bargaining representative of its employees and to require the non-union employees, as a condition of employment, to pay a fair share of the union's cost of negotiating and administering a collective bargaining agreement. *Id.* at 737 (citing *Chicago Teachers Union, Local No. 1 v. Hudson,* 475 U.S. 292, 302, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986)). The *Ford* court also recognized the limitations placed upon what non-members could be charged for as part of any fair share agreement. 675 N.E.2d at 737.

The *Ford* court, citing *Hudson,* 475 U.S. at 306, 106 S.Ct. 1066, held that "[a] remedy which merely offers dissenters the possibility of a rebate does not avoid the risk that the dissenters' funds may be used

temporarily for an improper purpose." 675 N.E.2d at 737. "A forced exaction followed by a rebate equal to the amount improperly expended is thus not a permissible response to the nonunion employees' objections." *Id. Accord Hudson,* 475 U.S. at 306, 106 S.Ct. 1066. In *Ford,* the union did not dispute that its membership dues included expenses not properly chargeable to non-members; yet, the fair share provision called for non-union members to pay a fee equivalent to membership dues. From this, the *Ford* court concluded that the allegedly fair share fee included expenses not properly chargeable to non-union members. Although the union claimed that the rebate provision cured any such infirmity, the court reiterated that a fair share fee which requires a refund to make it proper is not truly a "fair share" fee. 675 N.E.2d at 738.

The union in *Ford* further claimed that because the non-member teachers had yet to pay the fee, there had been no showing of a violation of their First Amendment rights. The court disagreed and held that the master contract affirmatively provided that the non-members were obliged to pay the fee and that the fee was improper. This, the court held, was a sufficient violation of the non-members' rights to support summary judgment. *Id.* at 739. The union also argued that the rebate procedure had never been followed, and that they had used an arbitration procedure to calculate the properly chargeable expenses and sought this amount as the fair share fee. Again the court rejected the union's argument, holding that the master contract was the sole authority for the union to collect fees from the non-members, and that the contract called for the collection of a fee which contained improperly charged expenses. *Id.* Despite any procedures used by the union to avoid the language of the contract, the contract still violated the

rights of the non-members. *Id.* The *Ford* court reversed the trial court and remanded with instructions to grant summary judgment to the non-member teachers.

In the case at bar, the Employees claim that, as in *Ford,* the agreement authorizing the collection of fair share fees allows for inclusion of non-chargeable expenses. The Employees argue that even if the Union does not actually charge non-members for improper expenses, the Settlement would permit such. Therefore, according to the Employees, the Settlement is invalid in the same manner as was the master contract in *Ford.*

We discern several differences between the Settlement in the present case and the master contract in *Ford.* The master contract clearly called for the collection from non-union members of fees which included non-chargeable expenses. Although the Settlement prohibits the use of the fair share fee for political contributions, it does not, as the Employees allege, allow for the use of the fair share fee for any and all other purposes, whether properly chargeable or not. The Settlement defines the fair share fee as "the costs of providing Union representation...." Appellant's Appendix at 1. It is the cost of union representation in collective bargaining which specifically is chargeable to non-union employees. *See Hudson,* 475 U.S. at 301, 106 S.Ct. 1066 (noting Court's rejection of claim that it is unconstitutional to require non-union employees, as a condition of employment, to pay a fair share of the union's cost of *negotiating and administering a collective bargaining agreement* ); *Lehnert,* 500 U.S. at 517, 111 S.Ct. 1950 (use of non-member's assessments for purposes of collective bargaining, contract administration, and grievance adjustment is constitutionally permissible). Therefore, we interpret this language in the Settlement to authorize a fair share fee which includes *only* chargeable expenses. Thus, unlike the master contract in *Ford,* the Settlement does not call for the collection of fees from non-members for clearly impermissible uses.

Moreover, the Settlement does not provide for a rebate of non-chargeable expenses, as did the contract in *Ford.* In fact, the Settlement specifically provides that:

"All monies collected by the Union pursuant to this [fair share] provision must be held in escrow until it is determined by a court of general jurisdiction that this fair share provision is lawful. If a court determines that this fair share provision is not lawful, the Union shall return the monies held in escrow plus interest to the affected employees." Appellant's Appendix at 1.

Until the fees have been determined to be lawful, the Union has no access to the money collected from the Employees. This is a radically different situation than that presented in *Ford,* wherein the master contract itself, despite the union's activities otherwise, called for the collection of a fee which included non-chargeable expenses followed by a rebate of non-chargeable expenses. The master contract in *Ford* explicitly called for the collection and at least temporary use of the non-members' money for non-chargeable expenses. Here, the Settlement avoids such concerns through the clause calling for the funds to be held in escrow, for judicial review, and a return with interest of any amount determined by a court to be non-chargeable. Therefore, we hold that the Settlement is not facially unconstitutional as alleged by the Employees. *See Whitley County Teachers Ass'n v. Bauer,* 718 N.E.2d 1181, 1188 (Ind.Ct.App.1999) (where fair share provision did not call for non-members to pay full fee, dispute the fee, and then await a refund, *Ford* was inapplicable), *trans. denied.*

## III

### Audit of Expenses

■ The Employees claim that the Union failed to have an auditor verify its allocation of non-chargeable expenses for the local Union council, Council 62.[10] The Employees claim that this means that the Union has failed to comply with the United States Supreme Court's decision in *Hudson, supra.* In *Hudson,* the Supreme Court held that the constitutional prerequisites for a union's collection of fair share fees include: (1) an adequate explanation of the basis for the fee; (2) a reasonably prompt opportunity to challenge the amount of the fee before an impartial decision-maker; and (3) an escrow account for the amounts reasonably in dispute while such challenges are pending. 475 U.S. at 310, 106 S.Ct. 1066. Here, the Employees argue that the Council failed to comply with the first requirement of *Hudson.* If so, the Employees continue, the Council's collection practices are unconstitutional and the trial court should have granted summary judgment in their favor instead of the Union.

In *Hudson,* the union's collection procedures were held to be unconstitutional in part because they failed to provide non-union employees with adequate information about the basis for the fair share fee the union sought to collect. *Id.* at 306, 106 S.Ct. 1066. The Court wrote:

"Basic considerations of fairness, as well as concern for the First Amendment rights at stake, also dictate that the potential objectors be given sufficient information to gauge the propriety of the union's fee. Leaving the nonunion employees in the dark about the source of the figure for the agency fee—and requiring them to object in order to receive information—does not adequately protect the careful distinctions drawn in *Abood* [*v. Detroit Board of Educ.,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977) ]." *Hudson,* 475 U.S. at 306, 106 S.Ct. 1066.

The information provided to the non-union employees in *Hudson* identified the amount which the union admitted it had expended for non-chargeable activities. This was inadequate according to the *Hudson* Court because, "[a]n acknowledgment that nonmembers would not be required to pay any part of 5% of the Union's total annual expenditures was not an adequate disclosure of the reasons why they were required to pay their share of 95%." *Id.* at 307, 106 S.Ct. 1066. Immediately following this text, the Court inserted a footnote reading in pertinent part, "The Union need not provide nonmembers with an exhaustive and detailed list of all its expenditures, but adequate disclosure surely would include the major categories of expenses, *as well as verification by an independent auditor.*" *Id.* at n. 18, 106 S.Ct. 1066 (emphasis supplied).

The Employees claim that this language requires the Council to perform what they refer to as an "allocation audit," i.e., an audit of the allocation of chargeable and non-chargeable expenses. The nature of the verification mentioned by the *Hudson* Court is not entirely clear. Several courts have rejected arguments similar to that of the Employees, reasoning that such an audit would require the auditor to make the legal determination of whether expenses are chargeable or not. *See e.g., Ping v. Nat'l Educ. Ass'n,* 870 F.2d 1369

---

10. The appellee-plaintiff Union in the present case is AFSCME Council 62; however, the amount being sought by Council 62 includes council-level expenses and expenses of AFSCME International. The Employees admit that AFSCME International performed such an "allocation" audit and do not challenge the International's audit on this ground.

(7th Cir.1989) (finding no support for argument that auditor should make legal determination of whether expenses are chargeable); *Andrews v. Educ. Ass'n of Cheshire*, 829 F.2d 335 (2d Cir.1987) (holding that *Hudson* requires audit to fulfill usual function of ensuring that expenditures which union claims were made for certain expenses were made for those expenses, and rejecting claim that breakdown of expenditures into categories of chargeable activities was required where audit provided for independent verification of past year's expenditures). Other courts have concluded otherwise and held that an audit of the allocation of expenditures into such categories would not require the auditor to make any legal determination. *See e.g., Mitchell v. Los Angeles Unified Sch. Dist.*, 739 F.Supp. 511 (C.D.Cal.1990) (noting that an auditor is not required to make a legal determination between chargeable and non-chargeable expenses, but instead need only verify that the expenditures made by the union were indeed actually made and verify that they have been allocated in accordance with certain disclosed criteria); *Hohe v. Casey*, 727 F.Supp. 163 (M.D.Pa. 1989) (holding that audit must include verification of the breakdown between chargeable and non-chargeable expenses), *aff'd in part, vacated in part* 956 F.2d 399 (3rd Cir.1992).

Although not cited by either party, the issue of the requirements of an audit of fair share fees has been presented to this court before in *Bauer, supra*. In *Bauer*, a teachers union brought suit to collect fair share fees from non-union teachers for 1993–1994 and 1994–1995 prior to the 1995 amendment to the statute. Upon the union's appeal of the trial court's decision in favor of the non-union teachers, the teachers claimed that the union's collection procedures failed to meet the *Hudson* standards—specifically that there had been inadequate disclosure of financial information and that no independent audit of the local union's expenses had been provided. In addressing this question, the *Bauer* court stated, "it is not clear that *Hudson* would require an audit in every situation." 718 N.E.2d at 1191. The *Bauer* court noted that some jurisdictions had found that the lack of an independent audit of the local association's expenses does not render a union's collection procedures constitutionally deficient. *Id.* at 1191–92 (citing *Prescott v. County of El Dorado*, 915 F.Supp. 1080 (E.D.Cal.1996); *Andrews v. Educ. Ass'n of Cheshire*, 653 F.Supp. 1373 (D.Conn.1987), *aff'd* 829 F.2d 335 (2d Cir.1987)).

The *Bauer* court quoted from the *Prescott* case at length:

" '[T]he emphasis on practicality in Hudson ... contraindicates the imposition of an annual auditing obligation. These practical considerations must include the ability of a small union to financially afford the procedures required by the Court for maintaining an agency shop [fair share] arrangement. While the union cannot jeopardize the First Amendment rights of the nonmembers for practical reasons, those rights are already protected by requiring the union to explain the breakdown between chargeable and nonchargeable expenditures, to escrow any reasonably disputed fee, and to provide a prompt, neutral procedure by which to challenge the fee.' " *Bauer*, 718 N.E.2d at 1192 (quoting *Prescott*, 915 F.Supp. at 1090).

The *Bauer* court continued:

"In *Hudson* the Supreme Court was dealing with the Chicago Teachers Union which the Court noted transferred $2,167,000 to its affiliated state and national labor organizations. *Id.*, 475 U.S. at 307, n. 18, 106 S.Ct. 1066. Here, the local association had a 1993–1994 annual

school year budget of $3,475.00 and a 1994–95 budget of $2,800.00.... In *Andrews*, the court noted that the requirement of an independent audit 'appears to apply only to the union involved in the *Hudson* case itself' and is justified in that case 'by that particular union's size and the amount of money involved.' *Andrews*, 653 F.Supp. at 1377. Consequently, we find, that under the facts of the case at bar, the lack of an independent audit of the local association, WCTA, does not render the procedures followed by the WCTA constitutionally deficient." *Bauer*, 718 N.E.2d at 1192. Thus, we can conclude from *Bauer* that, in certain situations, an independent audit of the local union's expenses is not required.

Here, the Employees admit that the Union performed a basic audit of its council-level expenditures. Thus, the Union here went farther than did the local union in *Bauer*, which had apparently performed no audit. This militates against us holding that the Union's audit was inadequate. However, in *Bauer*, the local union's total budget was particularly small—no more than $3,500, whereas in the case at hand, the Union's council-level expenditures for the year in question, fiscal year 1998, totaled $1,017,900. Moreover, the Employees claim, and the Union does not deny, that the international branch of the Union did perform an "allocation" audit. This suggests that such audits are not entirely unfeasible. Although we might agree with the Employees that a verification of the Union's breakdown of chargeable and non-

chargeable expenses would provide more financial disclosure to non-union members, we decline to hold that such an audit, under the facts of this case, was constitutionally required pursuant to *Hudson*.

The essence of the *Hudson* decision is that the objecting employees must be given "sufficient information to gauge the propriety of the union's fee." 475 U.S. at 306, 106 S.Ct. 1066. In *Hudson*, the information provided to the non-union employees only identified the amount which the union admitted it had expended for non-chargeable activities, which the Court held was inadequate. By contrast, here the Union provided the Employees with an audited financial statement breaking down the Council's expenses into twenty-three categories.[11] Following this statement is a listing of these expenses, grouped into eight categories, and the Council's determination of whether and to what extent the expenses in these categories were chargeable to non-union employees. The notice also informed the non-union employees that they could challenge the Union's fees through arbitration.[12] We hold that this information, which is based upon the admittedly audited financial statement, is sufficient to comply with the disclosure required by *Hudson*.

We find support for this holding in *Andrews*, 829 F.2d at 340, wherein the court held that *Hudson*'s audit requirement is designed to ensure that the usual function of an auditor is fulfilled, i.e. to ensure that

---

11. These categories include salaries, insurance, employee expense reimbursement, professional services, payroll taxes, communication expenses, auto allowance, convention and travel costs, in town per diem, pensions, printing and duplicating services, office supplies and expenses, depreciation, repairs and maintenance, contributions, member reimbursement, organizing expenses, other expenses, loss on disposal of assets, conference and legislation, bargaining committee expenses, interest expense, and rental expense.

12. The Union did present its case to an arbiter. Although none of the Employees apparently participated in this arbitration, the parties agreed at oral argument that such arbitration was not binding upon the Employees.

the expenditures which the union claims it made for certain expenses were actually made for those expenses. In *Andrews*, the union's collection plan was sufficient where it called for an audit verifying the union's past-year's expenditures but not an audit of the breakdown of expenditures to each major category of chargeable activities. *Id.* A similar result was reached in *Gilpin v. Am. Fed'n of State, County, and Mun. Employees, AFL–CIO*, 875 F.2d 1310 (7th Cir.1989), *cert. denied* 493 U.S. 917, 110 S.Ct. 278, 107 L.Ed.2d 258. In *Gilpin*, the court held that the union's notice to non-union employees met *Hudson* requirements where it categorized the union's activities into categories and indicated whether the union considered these categories wholly chargeable, wholly non-chargeable, or partially chargeable. The notice also contained a list of the expenditures listed in the union's audited financial statement and indicated which activities the union considered to be chargeable and what percentage of each expenditure category was allocated to chargeable activities. The notice also stated that an arbitrator had found the union's allocation of expenses proper. The *Gilpin* court held this was sufficient to allow the employees to decide whether there was a reason to mount a challenge. *Id.* at 1316.

· Moreover, the Employees here, unlike the non-union employees in *Hudson*, are further protected by that portion of the Settlement requiring the Union to place "[a]ll monies" collected by the Union under the fair share provision in escrow. Appellant's Appendix at 1. Therefore, the Union provided the Employees with sufficient information in compliance with *Hudson*. Nevertheless, although the Union's notice complied with *Hudson*, it does not necessarily follow that the Union met its burden of proving that its fair share fees are constitutionally proper.

■ There is a difference between the Union meeting the notice requirements of *Hudson* as a prerequisite before it can collect fair share fees and the Union meeting its final burden of proving that its calculation of the fair share fee is correct. As noted by the court in *Dashiell v. Montgomery County*, 925 F.2d 750, 756 (4th Cir.1991), at the *Hudson* notice stage, computation cannot be made with mathematical precision, and the information supplied by the union to the non-union employees need not, at that stage, be in such detail as to provide all available data and information on the anticipated assessment. "To impose such a requirement would result in circulation of a document as long and complicated as an SEC prospectus." *Id.* (citing *Gilpin*, 875 F.2d at 1316).

"The test of adequacy of the initial explanation to be provided by the union is not whether the information supplied is sufficient to enable the employee to determine in any final sense whether the union's proposed fee is a correct one, but only whether the information is sufficient to enable the employee to decide whether to object. If the employee objects, *then* the union will be called upon to demonstrate more completely its justification for the fee, because '[t]he burden of proof in establishing the charges validly chargeable ... rests on defendant unions.'" *Dashiell*, 925 F.2d at 756 (quoting *Beck v. Communications Workers of America*, 776 F.2d 1187, 1209 (4th Cir.1985)).

We therefore turn to the Employees' other arguments relating to whether the Union did meet its burden of proving the validity of the charges included in the fair share fee.

IV

*Sufficiency of Union's Evidence*

■ Although the non-union employees bear the burden of objecting to the fair

share fee, once such objection has been made, the union seeking to collect the fair share fee bears the ultimate burden of proof; this is so because the union possesses the facts and records from which the proportion of chargeable to non-chargeable union expenditures can reasonably be calculated. *Hudson,* 475 U.S. at 306, 106 S.Ct. 1066; *Bhd. of Ry. and S.S. Clerks v. Allen,* 373 U.S. 113, 122, 83 S.Ct. 1158, 10 L.Ed.2d 235 (1963). The Employees claim that the trial court's grant of summary judgment in favor of the Union was improper as the Union failed to meet this burden.

### A. Time Records

The Employees first complain that the Union Council 62 kept insufficient records of the time its employees spent on various activities. The Employees claim that without such time records, it is impossible to allocate the Union's council-level labor costs between chargeable and non-chargeable time spent by its employees. The Union responds that timesheets are not required and that the evidence it designated to the trial court was sufficient to establish the proper amount of chargeable expenses, noting that absolute precision is not to be expected or required in the calculation of chargeable expenses. *See Flosenzier v. John Glenn Educ. Ass'n,* 656 N.E.2d 864, 868 (Ind.Ct.App.1995), *trans. denied.*

The Union also cites *Fort Wayne Educ. Ass'n, Inc. v. Aldrich,* 585 N.E.2d 6 (Ind. Ct.App.1992), *trans. granted,* in support of its argument that employee time records are not required. The *Aldrich* court held that, since absolute precision is not required, the union's method of proving non-chargeable expenses, which did not include contemporaneous employee time records, was not unconstitutional. *Id.* at 12. However, our Supreme Court granted transfer

in the *Aldrich* case, set aside the Court of Appeals' opinion, and remanded the cause to the trial court for further proceedings in light of the Court's adoption of the Court of Appeals' decision in *Albro, supra.* Although the Union claims that the *Aldrich* case was vacated upon other grounds, we cannot agree. That portion of *Aldrich* relied upon by the Union specifically refers to the union's burden of proving *non-chargeable* expenses. *Aldrich,* 585 N.E.2d at 12. The *Albro* opinion adopted by our Supreme Court held that unions must prove chargeable expenses, not non-chargeable expenses. 585 N.E.2d at 669. *See also Lehnert,* 500 U.S. at 524, 111 S.Ct. 1950. Moreover, the *Albro* opinion clearly holds that "this court erred in previously approving the methodology used by [the unions] in these cases [including *Aldrich* ]." 585 N.E.2d at 669. We thus conclude that the *Aldrich* case is no longer valid precedent.

Still, as noted by the *Albro* court, absolute precision is neither expected nor required and:

> "the only difference is that now the absolute precision is not expected or required in proving the affirmative, i.e., the chargeable expenses, rather than in proving the negative, i.e., the noncharge-able expenses. Similarly, this court continues to hold that imposing a heightened standard of proof, such as clear and convincing evidence as opposed to the existing standard of preponderance of the evidence, is inappropriate." 585 N.E.2d at 670.

We are still left with the question of whether the Union here was required to keep employee time records in support of its calculation of chargeable expenses. The Union claims that the evidence it submitted is sufficient to meet the preponderance of the evidence standard. This evidence is contained in the affidavits

of Susan Leib, staff attorney for AFSCME Council 62, and Linda Ard, then Executive Director of AFSCME Council 62.[13] The pertinent portion of Ms. Leib's affidavit reads as follows:

"11. Prior to the arbitration, I solicited information from staff members of AFSCME Council 62 documenting time spent on both chargeable and non-chargeable activities for the fiscal year ending June 30, 1998. Council 62 staff is assigned as Staff Representatives or Organizers. The salaries of Organizers employed by Council 62 were considered totally nonchargeable to nonmember fair share fee payers, even though they may have performed some chargeable duties. I reviewed the job duties and job assignments of Staff Representatives, and determined that all of their salaries were chargeable to nonmember fair share fee payers. Staff Representatives assisted in negotiations, contract administration, and grievance processing.

12. I personally reviewed the activities of the Executive Director and Associate Director of Council 62 for the fiscal year ending June 30, 1998, which had been recorded by these employees contemporaneously with the time at which the work was performed or the expense incurred.

13. Based upon my analysis and review of documents, I determined that a weighted average of 78.32% of personnel expenses for Council 62 was chargeable to nonmember fair share fee payers for

1999 (based upon the fiscal year ending June 30, 1998)." Appellant's Appendix at 28.

Our review of the designated evidence reveals no documentary evidence supporting Ms. Leib's sworn statement.

In a supplemental affidavit, Ms. Ard stated that she had personal knowledge of the yearly activities of the Council's Executive Director, that during the fiscal year ending June 30, 1998, the Executive Director had performed 2593 hours of chargeable activities, and that based upon a ratio of chargeable hours to total working hours, 90.66% of the Executive Director's time was chargeable. Ms. Ard also stated that, based upon a review of her activities during the fiscal year, she had performed 2597 hours of chargeable activities, which amounted to 90.80% of her time being chargeable.

The Employees refer us to no evidence which counters the information contained in these affidavits, but instead refer to the affidavit of their expert witness, Irving B. Ross, CPA.[14] Mr. Ross's affidavit states:

"In order to comply with its requirements for calculating an agency fee, it is critical that AFSCME Council 62 require its employees to accurately complete some form of a time report. Such time reports should provide sufficient information as to whether each activity described is either chargeable or non-

**13.** At the time of her supplemental affidavit, Ms. Ard had been Executive Director of AFSCME Council 62 since February 1, 1999. Before this, she was Associate Director and Steve Fantauzzo was Executive Director.

**14.** In its brief, the Union claims that "Mr. Ross's conclusions are entitled to no weight for the reasons set forth in AFSCME's Memorandum in Support of Plaintiff's Motion to Strike Affidavits of Ross and Dahl." Appellee's

Brief at 24. The trial court denied the Union's motion to strike these affidavits, and the Union develops its argument no further in its brief. The Union cannot incorporate by reference an argument not made in its brief. *See* Ind. Appellate Rule 46(B)(2) (argument contained in the appellee's brief must address the contentions raised in the appellant's argument). Therefore, we decline the Union's invitation to disregard Ross's affidavit.

chargeable. Sufficient information would include, among other things, a specific description of the activity in terms of its chargeable/nonchargeable nature, as well as the reason for and location of the activity. Without this information, any form of time sheet or Weekly Activity Report Form would be incomplete and result in an unacceptable risk that the data would lead to incorrect assumptions and significantly affect an accurate accumulation of chargeable and nonchargeable expenses." Appellant's Appendix at 74.

Mr. Ross's affidavit raises no factual issues regarding whether the statements contained in the Leib and Ard affidavits are true. He simply claims that such conclusions cannot be accurately made without time records. This, however, is the question of law before us. Mr. Ross also stated:

"I reviewed seven Expense Reports and Weekly Activity Reports of Debra Garcia, an AFSCME Council 62 Staff Organizer according to Ms. Leib. (Exhibit 'A'). None of these reports contain any specific references to organizing activities. In my opinion, no one could determine from these documents whether her activities were chargeable or nonchargeable. AFSCME Council 62 employees Roger Lamberson, Vicki Lee, Lila Martinez and Danny McKeand, by virtue of not being singled out by Ms. Leib as 'Organizers,' I assumed were 'Staff Representatives.' As such their salaries, according to Ms. Leib, were considered chargeable. However, in reviewing their respective expense reports, each indicated time spent on 'organizing' activities (Exhibit 'B')." Appellant's Appendix at 75.

As far as Ms. Garcia is concerned, Mr. Ross's statements are beside the point. Although he states that no one could determine whether her activities were chargeable or non-chargeable, Ms. Leib specifically stated in her affidavit that the salaries of Council 62 employees deemed "organizers," which Mr. Ross admits Ms. Garcia to be, were not charged to the non-union employees. We fail to see how the Employees can be harmed even if Mr. Ross's statement is true, as the Employees were not charged any portion of Ms. Garcia's salary.

▮ Regarding the employees Lamberson, Lee, Martinez, and McKeand, "Exhibit B" to Mr. Ross's affidavit contains expense reports filled out by these employees, all of which indicate that these employees spent time on activities involving organizing.[15] In her supplemental affidavit, Ms. Ard stated that Lamberson, Lee, Martinez, and McKeand were not and had never been employees of Council 62, but were instead members of local union organizations. The Union's calculation of fair share fees does not include any expenses of the local union. This is in direct conflict with Mr. Ross's assertions in his affidavit that these individuals were employees of Council 62. If Mr. Ross is to be believed, the Union has treated, as chargeable, expenses incurred by employees engaged in non-chargeable activities. If Ms. Ard is to be credited, the expenses of these employees were not included in the Union's calculations of the fair share fee. There is a genuine issue of material fact as to whether these employees work for Council 62 or the local union. *See Indiana Michigan Power Co. v. Runge,* 717 N.E.2d 216, 227 (Ind.Ct.App.1999) (summary judg-

---

**15.** Organization activities by unions are not chargeable to non-members. *Albro,* 585 N.E.2d at 673.

ment must be denied if resolution hinges upon the credibility of witnesses).

Nevertheless, with regard to the rest of the Union's evidence, we hold that there was sufficient evidence to establish prima facie what expenses were chargeable to the non-union employees, and that employee time records, under the facts of this particular case, were not required. In so holding, we emphasize that absolute precision is neither expected nor required.[16] *See Albro*, 585 N.E.2d at 670. Here, the affidavits are not merely conclusory statements that a certain percentage is chargeable to the non-union employees. The Union's evidence indicates that, based upon job function, it considered certain employees' salaries completely non-chargeable and certain employees' salaries as completely chargeable. As to the Director and Associate Director, who performed both chargeable and non-chargeable activities, the Union calculated the hours these employees spent on listed chargeable activities, and calculated what percentage of their time was spent on chargeable activities. Based upon this, Ms. Leib calculated the amount of employee salaries chargeable to non-union employees. This was sufficient to establish the Union's council-level employee expenditures without the use of employee time records.

We also note, however, that keeping employee time records does not seem to be a particularly onerous burden for a union to bear, especially if such would simplify and expedite its calculation and collection of fair share fees which are challenged by objectors. Nevertheless, the Union was not required to present employee time records in order to carry its burden of proving chargeable expenses. As stated, the

Employees do raise a genuine issue of material fact regarding the employment status of Lamberson, Lee, Martinez, and McKeand, and this factual issue must be determined by the trial court upon remand.

## B. Administrative Costs

■ The Employees also claim that the trial court erred in granting summary judgment in favor of the Union in that the Union treated certain administrative and overhead costs as entirely chargeable to non-union employees. The Employees cite to the transcript of the arbitration proceedings wherein Ms. Leib stated that, in calculating the chargeable expenses, she treated salaries for receptionists and business managers as 100% chargeable. The Employees also claim that 100% of the costs of the Union's headquarters and offices in Fort Wayne and South Bend were considered chargeable. The Union does not deny this, but claims that this is not improper.

A similar claim was before the court in *Flosenzier*, 656 N.E.2d at 865. In *Flosenzier*, the trial court had granted summary judgment to the union in its action to collect fair share fees from certain non-union teachers. The non-union teachers appealed, claiming that the evidence submitted by the union was insufficient to meet the union's burden of proving chargeable expenses. In arguing that they had demonstrated the existence of a genuine issue of material fact, the teachers referred to affidavits and testimony which the court held "d[id] not identify facts in dispute or otherwise raise issues." *Id.* at 871. The court continued, "The mere statement that there was no factual basis for the Associations' assertion that its ex-

---

**16.** Although we recognize that the *Aldrich* opinion has been vacated, we still agree with the court's conclusion that, since absolute precision is not required, a union's failure to keep time records is not necessarily fatal to its collection of fair share fees. *See* 585 N.E.2d at 12.

penses for administering its corporate status and dealing with its employees are chargeable is not, by itself, sufficient to raise a genuine issue of material fact which would preclude summary judgment." *Id.* Nevertheless, the court observed in a footnote that even if this statement raised the issue of administrative expenses:

"the treatment of such expenses as chargeable is supported by decisions from the Illinois Employee Labor Relations Board. *See Round Lake* (1989), 5 PERI 1183; *Alton* (1990), 6 PERI 1118; *DuQuoi* (1988), 4 PERI 1064. The Supreme Court has also held that expenses for union conventions are chargeable. Administrative and overhead costs, like convention expenses, are necessary for maintenance of the Associations' 'corporate or associational existence,' and thus are fully chargeable to non-members." *Flosenzier*, 656 N.E.2d at 871 n. 11 (citing *Ellis v. Bhd. of Ry., Airline, and S.S. Clerks*, 466 U.S. 435, 448, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984), and *Lehnert*, 500 U.S. at 518, 111 S.Ct. 1950).

In the case of *DeBaets v. Nat'l Educ. Ass'n–South Bend*, 657 N.E.2d 1236 (Ind. Ct.App.1995), *trans. denied*, the non-union teachers claimed error in that the union had included certain administrative expenses as fully chargeable. Upon appeal, the *DeBaets* court stated:

"the very nature of the free rider problem and the governmental interest in overcoming it require that the union have a certain flexibility in its use of compelled funds .... The furtherance of the common cause leaves some leeway for the leadership of the group .... The cost of proving the precise amount of a chargeable expense could be greater than the expense itself, and for that reason a union should be afforded some leeway ....

Our review of the record reveals that the mortgage and building renovation expenses accounted for .052% of [the union's] chargeable expenses and that the internal building operations, health services, purchasing, printing, mail distribution, casualty and liability insurance account for .044% of [the union's] chargeable expenses. These expenses are minimal in comparison to overall chargeable expenses, and we will not scrutinize the [union's] calculations." 657 N.E.2d at 1240 (citations omitted).

Here, the Employees acknowledge that *Flosenzier* and *DeBaets* do not support their position. The Employees argue instead that the language in *Flosenzier* was dictum and that the present case may be distinguished from the situation before the court in *DeBaets*. First, we agree with the Employees that the footnote in *Flosenzier* was dictum, as the court had concluded that there were no genuine issues of material fact and prefaced the footnote by saying "[a]ssuming arguendo, that this statement sufficiently raises the issue of administrative expenses ...." 656 N.E.2d at 871 n. 11.

In *DeBaets*, the court recognized that the administrative expenses and overhead costs in question there were minimal when compared to the overall chargeable expenses. Here, the Employees claim that the administrative expenses of which they complain are not minimal, but they refer only to total personnel expenses, and give no indication of what portion of these costs were improperly charged. As to the office expenses, however, the Employees note that AFSCME Council 62's office expenses were listed as totaling $86,669. When compared with the Union's total council-level expenses of $1,017,900, this amounts to 8.51%. We cannot call this amount de minimis.

We find it telling that AFSCME International did not charge 100% of its admin-

istrative expenses. According to the affidavit of Jeffrey Taggart, a CPA employed by AFSCME International, expenses for its Business Office, which is responsible for managing the union's headquarters in Washington, D.C. and for the operating expenses of the union, were not considered 100% chargeable. According to the Taggart affidavit, "[o]nce the amount of overhead to be allocated to any given department was determined, that amount was treated as chargeable at the same rate as were the operating expenses of that department." Appellee's Appendix at 133. Thus, AFSCME International allocated overhead costs as chargeable at the same rate per department as operating costs were chargeable. This seems to us a just and pragmatic method.

If a union's chargeable expenses, excluding overhead costs, were 60% of total expenses, it would seem improper to charge non-union employees for 100% of overhead costs, when such overhead costs would undoubtedly include some amounts that supported non-chargeable activities. A simple and equitable means of allocating these expenses would be to do as AFSCME International did here—to allocate administrative and other overhead expenses in proportion to the overall ratio, excluding of course administrative and overhead expenses, of chargeable versus non-chargeable expenses. Thus, we agree with the Employees that the trial court erred in treating 100% of administrative and overhead costs as chargeable to non-union employees. *Cf. Bromley v. Michigan Educ. Ass'n–NEA,* 82 F.3d 686, 696 (6th Cir. 1996), *cert. denied* 519 U.S. 1055, 117 S.Ct. 682, 136 L.Ed.2d 607 (1997).

### C. AFSCME International

■ The Employees also attack the sufficiency of the evidence submitted in support of that portion of the fair share fee which goes to AFSCME International. In the notice given to non-union employees,

the Union claims that 48.147% of the expenditures of AFSCME International, as reflected in the fair share fee sought, were chargeable. This figure was based upon financial data from the year ending December 31, 1997. However, the affidavit of Jeffrey Taggart and the extensive financial information submitted by the Union to support this figure cover the year ending December 31, 1998. The information contained in these 1998 records show that 41.04% of AFSCME International's expenses were chargeable, not 48.147%. The Union does not deny this, but claims that the Employees have procedurally defaulted this argument by failing to raise it at the trial court level.

In response to the Union's argument that the Employees failed to bring this to the attention of the trial court, the Employees note that they specifically argued this to the trial court on January 4, 2002, at a motion hearing. Thus, the Employees have not procedurally defaulted this issue.

■ The Union also claims that, apart from the financial information pertaining to 1998, it did present sufficient evidence to establish that 48.147% of AFSCME International's expenditures were chargeable. Specifically, it refers to an audited "Calculation of Chargeable Expense," which consists of a list of categories into which the expenditures are broken down. For each category there is an amount representing total expenses, the non-chargeable expenses, and the chargeable expenses. According to this sheet, a total of 48.147% of AFSCME International's total expenses were chargeable. The Union also cites to the affidavit of Kerry Korpi, director of research and collective bargaining for AFSCME International. This affidavit, however, simply explains AFSCME International's operations and the responsibilities and activities of its various departments; it contains no information supporting the amount AFSCME

International claims is chargeable. Without more, we cannot say that the Union has carried its burden of proving that 48.147% of AFSCME International's expenses for 1997 were chargeable. Unlike the evidence supporting the Union's council-level employee expenses, this 1997 evidence consists of conclusions that a certain percentage was chargeable. To the extent that the trial court's award includes this percentage of AFSCME International's expenses in the fair share fee, we must reverse.[17]

As noted, the Union did designate as evidence the affidavit of Jeffrey Taggart, which was supported by 193 pages of detailed financial information explaining and supporting AFSCME International's calculation of chargeable expenses for 1998. This evidence sufficiently indicates that, for that year, 41.04% of AFSCME International's expenses were chargeable. As the Union was seeking to collect fair share fees for the year ending in 1999, the 1998 financial data is a more appropriate measure of AFSCME International's expenses. *See Hudson,* 475 U.S. at 307 n. 18, 106 S.Ct. 1066 (noting that a union may properly calculate its fair share fee upon the basis of its expenses during the preceding year). Therefore, upon remand, the trial court should reduce the awarded fair share fee to reflect this lesser amount.

### Conclusion

Executive Order 90–6 does not prohibit the collection of fair share fees from non-union state employees. The Settlement agreement approved by the Governor does not unconstitutionally define what is chargeable to non-union employees. The notice sent to the Employees was sufficient to comply with the *Hudson* decision.

Although the Union was not required to produce employee time records to support its calculations of chargeable expenses, there are genuine issues of material fact regarding whether certain individuals are local-level or council-level employees. It was also improper for the Union to include 100% of administrative and overhead costs as chargeable. Although the evidence does not support the Union's claim that 48.147% of AFSCME International's expenses were chargeable, there is sufficient evidence to indicate that 41.04% of AFSCME International's expenses were chargeable.

The judgment of the trial court is affirmed in part, reversed in part, and the cause is remanded for proceedings not inconsistent with this opinion.

BAILEY, J., and MATHIAS, J., concur.

---

**17.** The Union claims that if the Employees wished to have more financial information regarding 1997, they could have sought discovery of such, but failed to do so. This argument misses the point; the Union, not the Employees, bears the burden of affirmatively proving chargeable expenses. *See Lehnert,* 500 U.S. at 524, 111 S.Ct. 1950; *Albro,* 585 N.E.2d at 668 n. 3.