Marie E. DASHIELL; William H. Van Aller; Harold L. Ritenour; Richard Newcome; Joe Mitchell Miller; David Ertter, On behalf of themselves and as a class of similarly situated employees, Plaintiffs–Appellants,

v.

MONTGOMERY COUNTY, MARYLAND; Sidney Kramer, County Executive; Lewis T. Roberts, Chief Administrative Officer; Montgomery County Council; Montgomery County Government Employees Organization; United Food and Commercial Workers, Local 400; Fiori-

gia Renne, Vice President, Local 400, United Food & Commercial Workers Union President, McGeo; Thomas R. McNutt, President Local 400 United Food & Commercial Workers Union, Defendants–Appellees.

No. 90–2350.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 30, 1990.

Decided Feb. 13, 1991.

Rehearing and Rehearing In Banc Denied March 4, 1991.

Rossie David Alston, Jr., National Right to Work Legal Defense Foundation, Inc., Springfield, Va., for plaintiffs-appellants.

William W. Thompson, II, Zwerdling, Paul, Leibig, Kahn, Thompson & Driesen, P.C. (on brief: Michael T. Leibig, Zwerdling, Paul, Leibig, Kahn, Thompson & Driesen, P.C.), Washington, D.C., for defendants-appellees.

Before HALL and NIEMEYER, Circuit Judges, and CACHERIS, United States District Judge for the Eastern District of Virginia, sitting by designation.

NIEMEYER, Circuit Judge:

In *Chicago Teachers Union v. Hudson,* 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986), the Supreme Court held that the First Amendment requires that nonunion employees in an agency shop be afforded an adequate advance explanation of the basis for the collective bargaining fee charged to them by the union as their exclusive bargaining agent. The explanation is necessary to provide information sufficient to enable the nonunion employees to object to and protect against compulsory participation, through the payment of funds, in union activities unrelated to collective bargaining. The First Amendment prohibits a compulsory subsidization, *even temporarily,* by nonunion employees of political or ideological causes to which they are opposed. *Id.* at 305, 106 S.Ct. at 1075.

Marie Dashiell and five other nonunion employees of Montgomery County, Maryland, have filed suit to challenge the adequacy of the explanation provided by their exclusive bargaining representative, the Montgomery County Government Employees Organization, a division of United Food and Commercial Workers Union Local 400 (the Union), for fees that the Union intended to charge nonunion employees in 1988. Specifically, they contend that the information provided to them had not been subjected to proper independent "verifications, audits or certifications in accordance with the principles of *Hudson.*" Brief of Appellants at v. Suit was brought under 42 U.S.C. § 1983 and the First and Fourteenth Amendments. The district court granted summary judgment in favor of the Union, concluding that neither the First Amendment nor the decision of the Court in *Hudson* requires that the Union's allocation decision in dividing chargeable expenses from those not chargeable be certified by an independent certified public accountant. The court explained that the allocation of those expenses is based on a complex legal judgment for which certified public accountants are not suited. It concluded that nonunion members receive a constitutionally adequate explanation if they are provided with the Union's position on that which is chargeable and that which is not, with only the amounts in each category verified by an independent auditor. *Dashiell v. Montgomery Co.,* 731 F.Supp. 1251, 1257–59 (D.Md.1990).

For the reasons that follow, we affirm the judgment of the district court.

I

In 1986 Montgomery County, Maryland, recognized the Union as the exclusive bargaining representative for all employees in a bargaining unit consisting of the County's office, professional and technical employees and in a bargaining unit consisting of the County's service, labor and trade employees. The Union entered into collective bargaining agreements for both units for the three-year period of July 1, 1987, through July 30, 1990, establishing an agency shop.

The Montgomery "County Collective Bargaining Law" permits public employees of

a bargaining unit to enter into an agency-shop agreement with the County under which all employees, whether union members or not, are required as a condition of employment to pay a "service fee" to the Union for its representation of the employees. Montgomery County Code, Title VII, §§ 33–101, *et seq.* The employees are not required to become members of the Union, but they are required to pay a service fee to the Union to cover their share of the costs and expenses related to collective bargaining. They are not, however, required to pay for other costs unrelated to collective bargaining.

To provide an explanation to nonunion employees of how the service fee, or agency fee as it is sometimes called, is computed, the Union sent each nonunion member a letter dated June 8, 1988, together with a packet of information. The letter advised that the service fee for the year 1988 would be set at 82.59% of the regular dues paid by voluntary union members, or $6.19 per month. The letter also specified the method by which an employee could object to the fee and established July 15, 1988, as the deadline for objecting. The attached packet contained lists and data supporting the amount of the fee, including audited financial records of the Union.

On review of the letter and the attached packet, Dashiell and the other five plaintiffs concluded that the information provided by the Union did not comply with the requirements described by the Supreme Court in *Hudson*, and they therefore filed this action. They contend that the notice contained "no audit opinion" by an independent accountant that verifies the allocation between expenses chargeable to all employees and expenses chargeable only to Union members. The district court granted the Union's motion for summary judgment and this appeal followed.

## II

The Supreme Court first considered the constitutionality of a union shop, of which an agency shop is a variation, in the context of the Railway Labor Act, 45 U.S.C. §§ 151 *et seq.* The Court concluded that Congress had the power, in the exercise of its right to regulate commerce, to permit a union shop "as a stabilizing force" to promote "industrial peace" and that the union shop provision of the Railway Labor Act, 45 U.S.C. § 152, Eleventh, did not violate the First or Fifth Amendments. *Railway Employees' Dep't v. Hanson,* 351 U.S. 225, 233, 238, 76 S.Ct. 714, 718, 721, 100 L.Ed. 1112 (1956). Ruling that the Railway Labor Act permissibly required beneficiaries of trade unionism to contribute to the costs of collective bargaining, the Court cautioned that "[i]f 'assessments' are in fact imposed [by the union] for purposes not germane to collective bargaining, a different problem would be presented." *Id.* at 235, 76 S.Ct. at 720. *See also International Ass'n of Machinists v. Street,* 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961) (legislative history of Railway Labor Act mandated a construction that the act did not authorize expenditures by unions of funds on political causes unrelated to collective bargaining).

These decisions rested on the implied principle that the governmental interest in trade unionism and the industrial peace that was anticipated justified the compromise of the First Amendment rights of dissenting employees. By governmental action these employees were compelled to associate with and participate in an organization with whose agenda and principles they disagreed. Later decisions of the Supreme Court expressly acknowledged the principle. *See Abood v. Detroit Bd. of Educ.,* 431 U.S. 209, 222, 97 S.Ct. 1782, 1792, 52 L.Ed.2d 261 (1977) (interference in employees' First Amendment rights are justified by the legislative assessment of the importance of union shops to the system of labor relations); and *Ellis v. Railway Clerks,* 466 U.S. 435, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984). In *Ellis* the Court said:

> [B]y allowing the union shop at all, we have already countenanced a significant impingement on First Amendment rights. The dissenting employee is forced to support financially an organization with whose principles and demands he may

disagree.... It has long been settled that such interference with First Amendment rights is justified by the governmental interest in industrial peace.

*Id.* at 455–56, 104 S.Ct. at 1896.

■ Because First Amendment freedoms are compromised by a state-authorized union or agency shop, any impingement must be drawn as narrowly as is consistent with the state's interest in permitting an exclusive representative to represent all employees for collective bargaining purposes. In the context of state action, therefore, if a union strays from its permitted function of collecting funds for collective bargaining activities, its conduct will be prohibited. *See Abood*, 431 U.S. at 234–36, 97 S.Ct. at 1799–1800 (the First Amendment prohibits a state-employee union from collecting fees from nonunion employees to fund ideological causes to which the employees were opposed).

■ The First Amendment will not tolerate a compulsory subsidization, even if only temporarily, by nonunion employees of fees used for union activities unrelated to collective bargaining. The union therefore may not use a rebate approach under which it collects uniform union dues from all employees and later returns the portion unrelated to collective bargaining to nonunion employees. *Ellis*, 466 U.S. at 443–44, 104 S.Ct. at 1889–90. The union must use an approach by which amounts charged for collective bargaining services are reasonably calculated to be correct from the outset.

Thus, in *Chicago Teachers Union v. Hudson* the Court specified procedures that must be followed by the union in allocating the proper charges to nonunion employees to safeguard their First Amendment rights. The Court held that the union must afford the employee the opportunity to participate in and object to the union's allocation of dues by (1) providing the employee advance information about the fee to be charged, (2) affording him a reasonably prompt opportunity to challenge the union's proposed fee before an impartial decisionmaker, and (3) retaining the disputed amount in an escrow account pending the decision by the impartial decisionmaker. 475 U.S. at 310, 106 S.Ct. at 1077. The advance information provided to nonunion employees has to be adequate to permit the employee "to gauge the propriety of the union's fee." *Id.* at 306, 106 S.Ct. at 1076. Amplifying this point in a footnote, the Court stated:

"Absolute precision" in the calculation of the charge to nonmembers cannot be "expected or required."

\*   \*   \*   \*   \*   \*

The Union need not provide nonmembers with an exhaustive and detailed list of all its expenditures, but *adequate disclosure surely would include the major categories of expenses, as well as verification by an independent auditor.*

*Id.* at 307 n. 18, 106 S.Ct. at 1076 n. 18 (emphasis added).

The narrow issue presented here is whether the segregating function, by which expenses are allocated into the nonchargeable and chargeable categories, must be audited by an independent accountant. The nonmember employees in this case contend that the First Amendment requires that there be an independent verification of the allocation itself, in addition to verification of the amount contained within each category. Brief of Appellants at 2, 23–24. The Union, on the other hand, argues that *Hudson* does not obligate the independent auditor to review the allocation decision between chargeable and nonchargeable expenditures. It argues that that decision is a legal one which does not fall within the province of an independent auditor and that the auditor is required only to verify the amounts assigned to the categories.

Although we have not had occasion to rule on the appropriate function of an independent auditor in verifying information supplied to nonunion members, other circuits have.

In *Andrews v. Education Ass'n of Cheshire*, 829 F.2d 335 (2d Cir.1987), the nonunion employees of an agency shop consisting of public school teachers challenged the verification process utilized by the union in

providing financial data. The nonunion employees contended that the actual allocation of expenses between those that were chargeable and those that were not should be audited by an independent auditor. In rejecting a requirement that would have the auditor making the legal decision of what is chargeable, the Second Circuit stated:

> Appellants' approach to this problem would have the auditor making a legal, not an accounting, decision regarding the appropriateness of the allocation of expenses to the chargeable and nonchargeable categories. We believe, however, that *Hudson's* auditor requirement is only designed to ensure that the usual function of an auditor is fulfilled. That usual function is to ensure that the expenditures which the union claims it made for certain expenses were actually made for those expenses.

*Id.* at 340.

Following *Andrews,* the Sixth Circuit in *Gwirtz v. Ohio Educ. Ass'n,* 887 F.2d 678 (6th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1810, 108 L.Ed.2d 941 (1990), concluded that auditors cannot be called upon to resolve those questions that are essentially legal:

> On the question of "verification" by an auditor, we reject the plaintiffs' argument that the function of the independent auditor is to verify the union's calculation of the chargeable or noncharge-able nature of the major categories of union expenditures. Whether a union expenditure is "chargeable" or "non-chargeable" to nonmember employees is a *legal* determination that depends upon the type of union activity for which the expenditure is made. It is not the role of an auditor to make such a legal determination.

*Id.* at 682 n. 3. In a later opinion by a different panel of the Sixth Circuit, however, the panel seemed to suggest that the question might still be open for discussion. In *Tierney v. City of Toledo,* 917 F.2d 927 (6th Cir.1990), the court said:

> *Gwirtz,* as well as courts in several other circuits, rejected arguments that an audi-

tor *must* be retained to make this *legal* determination. *See Gwirtz,* 887 F.2d at 682 n. 3; *see also Ping v. National Educ. Ass'n,* 870 F.2d 1369, 1374 (7th Cir.1989); *Andrews v. Educ. Ass'n of Cheshire,* 829 F.2d 335, 340 (2d Cir.1987). The officers do not argue here that an auditor cannot make such an allocation. We therefore need not address the issue, except to conclude that the union clearly has the burden of defending any challenge to the allocation.

*Id.* at 936 n. 7.

Finally, the Seventh Circuit in *Ping v. National Educ. Ass'n,* 870 F.2d 1369 (7th Cir.1989), reached the same conclusion as that reached by the Second Circuit in *Andrews.* The court in *Ping* stated:

> We find no support in either *Tierney v. City of Toledo,* 824 F.2d 1497 (6th Cir. 1987) or any other fair share case for the proposition that an independent auditor must make the *legal* determination of whether expenses are chargeable, non-chargeable, or subject to question. Indeed, that argument was explicitly repudiated by the Second Circuit in *Andrews.* 829 F.2d at 340.

*Id.* at 1374. *See also Gilpin v. American Fed'n of State, County and Mun. Employees, AFL–CIO,* 875 F.2d 1310, 1316 (7th Cir.) (notice is sufficient if it advises of activities that union considers chargeable and includes audited financial statement), *cert. denied,* —— U.S. ——, 110 S.Ct. 278, 107 L.Ed.2d 258 (1989).

We have found no circuit decision which supports the contention that an independent auditor is required to make the legal determination as to that which is chargeable and that which is not in order to satisfy the requirements of *Hudson.* Nevertheless, plaintiffs argue that we should adopt such a rule here, relying on *Mitchell v. Los Angeles Unified School Dist.,* 744 F.Supp. 938 (C.D.Cal.1990), and *Hohe v. Casey,* 727 F.Supp. 163 (M.D.Pa. 1989) (verification by independent auditor means verification of breakdown of chargeable and noncharageable expenses). *Mitchell,* however, does not adopt such a rule. The court there explicitly states that the

auditor's role is *not* to make legal determinations regarding the appropriateness of the allocation, but simply to verify that expenditures claimed for certain expenses were actually made. 744 F.Supp. at 941 n. 4. *See also Kidwell v. Transportation Communications Int'l Union*, 731 F.Supp. 192, 202 (D.Md.1990) (auditor not required to make legal decision of what is chargeable).

The core principle underlying all of the decisions prescribing allocation procedures is that the correct amount of a service fee to be charged nonunion employees for collective bargaining must be established, to the extent practicable, *in advance*. If these employees are charged more than due, even temporarily, they are compelled impermissibly, through the mandatory assessment of a fee, to support union causes to which they are opposed. Both *Hudson* and *Abood* rest on the observations of Thomas Jefferson and James Madison "about the tyrannical character of forcing an individual to contribute even 'three pence' for the 'propagation of opinions which he disbelieves.'" *Hudson*, 475 U.S. at 305, 106 S.Ct. at 1075; *see also Abood*, 431 U.S. at 234–35 n. 31, 97 S.Ct. at 1799–1800 n. 31.

■ Although this underpinning principle mandates that the union follow required procedures in advance of assessing a fee, the practicalities of imposing a charge in advance of the actual expenditures lead inevitably to the observation that the computation cannot at that stage be made with mathematical precision. *See Hudson*, 475 U.S. at 307 n. 18, 106 S.Ct. at 1076 n. 18. In a similar vein, the information supplied by the union to the employee need not, at that stage, be in such detail as to provide all available data and information on the anticipated assessment. To impose such a requirement would result in circulation of a document as long and complicated as an SEC prospectus. *Gilpin*, 875 F.2d at 1316. The test of adequacy of the initial explanation to be provided by the union is not whether the information supplied is sufficient to enable the employee to determine in any final sense whether the union's proposed fee is a correct one, but only whether the information is sufficient to enable the employee to decide whether to object. If the employee objects, *then* the union will be called upon to demonstrate more completely its justification for the fee, because "[t]he burden of proof in establishing the charges validly chargeable ... rests on defendant unions." *Beck v. Communications Workers of America*, 776 F.2d 1187, 1209 (4th Cir.1985) (*citing Brotherhood of Ry. & Steamship Clerks v. Allen*, 373 U.S. 113, 122, 83 S.Ct. 1158, 1163, 10 L.Ed.2d 235 (1963)), *aff'd on rehearing en banc*, 800 F.2d 1280 (4th Cir. 1986), *aff'd*, 487 U.S. 735, 108 S.Ct. 2641, 101 L.Ed.2d 634 (1988).

■ Thus, in its initial explanation to nonunion employees, the union must break its expenses into major descriptive categories and disclose those categories or portions thereof which it is including in the fee to be charged. *Hudson* also requires that the financial data be verified by an independent auditor. The verification requirement compels the union to have an independent auditor determine whether the amounts claimed by the union for chargeable activities are true.

The appellants' plea that we also require the auditor to review the Union's initial position taken in attributing expenses to be charged is tantamount to requiring the auditor to give a second legal opinion on whether categories were properly related to collective bargaining. This would require legal interpretations of several complex Supreme Court decisions by persons not professionally qualified to give them and might not advance the knowledge of the nonunion employees. To the contrary, it might only confuse the issues. The Union's position is just as well reviewed by the employees. Moreover, if the employees object, the Union will be called upon to justify further its position. For these reasons we reject the suggestion that we require the auditor to review the Union's initial allocation decision.

■ In summary, the First Amendment, as interpreted by *Hudson*, requires only that the union disclose as part of its initial

explanation to employees (1) such information that reveals to the employees major descriptive categories of expenses which will be assessed against the employees; (2) the component dollar amount of each category so chargeable; and (3) information to show that the financial figures have been verified by an independent auditor. No more could practicably be required at this stage. We, therefore, join the decisions in the Second, Sixth, and Seventh Circuits, which reach the same conclusion.

### III

■ Under a letter dated June 8, 1988, the Union in this case circulated a packet of materials to the nonmember employees whom it represented, which purports to provide the employees with the amount of service charge each employee would be assessed and the basis for the charge. In the cover letter, a summary of the charges is provided and the procedure for objecting is outlined. The packet accompanying the letter contains a list of all expenses of the Union as of December 31, 1987, segregated into categories of expenses which in turn are broken down into chargeable and nonchargeable amounts. The packet also contains audited lists of expenses, audited financial statements of the Union, and a statement of the allocation made by the national union of expenses chargeable to all employees.

The list of the Union's expenses is broken down into 35 descriptive categories. These categories are the same used by the Wisconsin Employment Relations Commission, Massachusetts Labor Relations Commission, and the New York Public Employee Relations Commission. The Union contends that the list has been approved by the National Right to Work Legal Defense Foundation, Inc., which represents the appellants in this case. *See* Brief of Appellee at 9 and J.A. 213.

For the most part, the expenses entered under each category on the list are either entirely chargeable to all employees or are chargeable only to Union members. For instance, categories of expenses denominated "meetings and dinners," "organizing expenses," "political contributions," and "charitable contributions" have been allocated only to Union members and are not charged to nonunion employees. On the other hand, categories denominated "arbitration and negotiation," "strike expenses," "data processing," and "office expenses" are shared by all employees and are included as part of the service fee charged for collective bargaining.

To each of these categories a dollar amount has been assigned from the overall expenses of the Union, which are contained on the audited financial records of the Union. Using these figures, the auditor computed the sums that were chargeable to all employees and those chargeable only to Union members. The auditor determined that 82.59% of the Union expenses were related to collective bargaining expenses and therefore chargeable to nonunion members. Accordingly, in its notice to nonunion members the Union proposed to charge nonunion employees 82.59% of the Union's $7.50 monthly dues, or $6.19.

Thus in this case the Union selected the descriptive categories for breaking down its overall expenses and supplied that list together with its financial records to an outside accounting firm. The Union also designated some categories chargeable, some not, and some mixed. In the mixed categories, the Union decided which parts were chargeable and which were not. The accounting firm, as part of its regular services, audited the financial records of the Union, including its expenses, and, by using the categories supplied, computed the amount chargeable to nonunion members. Thus, the accounting firm verified the amount of each expense claimed and confirmed the fact that it was spent where the Union claims it was spent. The accounting firm did not, however, review the Union's decision on what category was chargeable to nonunion employees and what category was not.

For those categories that are either entirely chargeable to all employees or that are entirely not chargeable, we find that the information supplied provides adequate notice to nonunion employees. A closer

question arises in connection with seven categories which were determined to be partly chargeable.

For instance, within the category denominated "Newsletter," the Union allocated $202,396, of the $282,282 of expenses incurred, to all employees as part of the service charge for collective bargaining. To make this allocation it reviewed each issue of the newsletter and determined which articles were on subjects related to collective bargaining and which were on unrelated subjects, such as political issues and union organizing. The Union apportioned the newsletter expense, relying on the proportion of related articles to the total. While the auditors reviewed the allocation and verified the expense, they could not review or verify whether a particular article was chargeable.

A similar problem arises in connection with the charge for "education and seminars." Of the total expense of $40,596 in this category, $16,646 was charged to nonunion employees. Again, the Union made the decision of which seminars were related to collective bargaining and which were not. The auditors could only verify that the expenditures were actually made and that they were made for the purposes claimed.

Undoubtedly the nonunion employees received less information on "mixed categories" than they did where an *entire* category was charged or excluded, because in the latter situation the category description provides the distinguishing information. In a mixed category circumstance, the employees cannot, by the description alone, know what is the basis of distinction between chargeable and nonchargeable expenses. The alternative, however, of providing to employees all the backup data and worksheets reflecting the judgment of the Union is impractical and addresses concerns that are beyond those which are relevant at this stage of the process.

With the information that the Union provided in this case, the nonunion employees could know, for example, that about 72% percent of the newsletter and about 41% of the seminar expenses were being charged to them. It is fair to assume that they received or had access to the newsletters and knew generally of the seminars, and from that vantage point together with their general knowledge of the Union's activities, they could make a reasonably informed judgment whether to object. Considering that the information need not be exhaustive, or even so encompassing as to allow the employees to determine finally whether the union is correct in the allocation, the information supplied by the Union here was adequate to enable the nonunion employees to make a decision whether to object. If they object, the Union will then have the burden to demonstrate before an independent decisionmaker that its position is justified. Accordingly, we affirm.

AFFIRMED.