07-3683-cv
Scheffer v. The Civil Service Employees Association

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term, 2008

(Argued:   December 3, 2008                                    Decided:   June 28, 2010)

Docket No. 07-3683-cv

DAVID H. SCHEFFER, MARY C. BERGEVIN, JOSEPH L. STEPHANY, LAURA J. SWARTZENBERG, on behalf of themselves and the class they seek to represent,

*Plaintiffs-Appellants*,

– v. –

THE CIVIL SERVICE EMPLOYEES ASSOCIATION, LOCAL 828; THE CIVIL SERVICE EMPLOYEES ASSOCIATION; AFSCME, LOCAL 1000; AFL-CIO; AND AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES, AFL-CIO,

*Defendants-Appellees.*

Before: JACOBS, MCLAUGHLIN, B.D. PARKER, *Circuit Judges.*

Appeal from a judgment of the United States District Court for the Western District of New York (Telesca, *J.*), dismissing claims brought by public-sector employees who, as nonmembers of the union that represents them for collective-bargaining purposes, challenge organizing fees assessed by the union. We conclude that although the union's fee disclosure procedures meet constitutional standards, charging these nonmembers for the organizing expenses at issue violates their First Amendment rights. AFFIRMED IN PART, REVERSED IN PART. Chief Judge Jacobs concurs in the judgment and in the opinion of the Court and files a separate concurring opinion.

> JOHN R. MARTIN, Milton L. Chappell, National Right to Work Legal Defense Foundation, Inc., Springfield, VA; Laurence B. Oppenheimer, Hiscock & Barclay, LLP, Buffalo, NY, *for Plaintiffs-Appellants.*

JOHN M. WEST, Matthew Clash-Drexler, Bredhoff & Kaiser, P.L.L.C., Washington, D.C.; Jules L. Smith, Blitman & King LLP, Rochester, NY, *for Defendants-Appellees*.

BARRINGTON D. PARKER, *Circuit Judge*.

Plaintiffs-Appellants David Scheffer, Mary Bergevin, Joseph Stephany, and Laura Swartzenberg are probation officers employed by Monroe County, New York. They work within a collective-bargaining unit represented by the Civil Service Employees Association, Inc. ("CSEA" or "the union"), Local 1000, AFSCME, AFL-CIO. Although they are not union members, they are nonetheless required by New York law to pay a fee to the union for certain union activities that benefit them. The primary issues on this appeal are whether the First Amendment permits charging them their proportionate share of the costs associated with some of the union's organizing activities, and whether CSEA's disclosure of how its expenses are allocated is constitutionally adequate.

The United States District Court for the Western District of New York (Telesca, *J.*) granted summary judgment to CSEA. *Scheffer v. Civil Serv. Employees Ass'n, Local 828*, No. 05-cv-6700, 2007 WL 2126286 (W.D.N.Y. July 25, 2007). The court concluded that the organizing activities in question were necessary to preserve and enhance the wages and benefits of existing union-represented employees, and were therefore sufficiently related to collective bargaining to allow the union to charge nonmember employees for them. The district court also concluded that the union's method of calculating and reporting the expenses of local affiliates met constitutional standards. We agree with the district court that the fee calculation and disclosure procedures are constitutional, but we hold that under the First Amendment, plaintiffs-appellants cannot be charged for the organizing expenses involving employees who perform entirely different types of work.

2

**BACKGROUND**

CSEA negotiates with approximately 900 employers across New York State on behalf of over 200,000 employees, mostly state and local government employees. The Monroe County unit is a subdivision of Local 828, which is one of roughly 375 CSEA "locals" in the state. New York has recognized CSEA as the exclusive bargaining representative for employees within the Monroe unit, which includes the appellants. *Id.* at *1-*2.

Under New York law, when a public employer has certified an exclusive bargaining representative to negotiate on behalf of employees, those employees pay dues to the union through automatic deductions from their paychecks. N.Y. Civ. Serv. Law § 208(1). Employees are not required to join the union. However, under both federal law and New York, a union certified as an exclusive bargaining agent is required to fairly represent all employees in the bargaining unit whether or not they are dues-paying members. *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 224 (1977); *Civil Serv. Bar Ass'n v. City of N.Y.,* 474 N.E.2d 587, 590-91 (N.Y. 1984). In light of this responsibility, New York (like many other states) allows public sector unions to collect by automatic deductions an "agency shop fee" in lieu of dues. The New York statute also provides, however, that the union must "refund to any employee demanding the return any part of an agency shop fee deduction which represents the employee's pro rata share of expenditures by the organization in aid of activities or causes of a political or ideological nature only incidentally related to terms and conditions of employment." N.Y. Civ. Serv. Law § 208(3)(a).[1] Meanwhile, federal constitutional

---

[1] This structure mirrors arrangements permitted by federal law and upheld by the Supreme Court. *See, e.g., Abood*, 431 U.S. at 224.

law requires a set of prophylactic procedures that unions must follow in collecting the fee, which include the requirement that nonmembers be given notice of the basis for the union's calculation of which expenditures are "chargeable" and "nonchargeable" to objectors, along with the opportunity to register an objection to paying the chargeable portion of the fee. *Chi. Teachers Union, Local No. 1 v. Hudson*, 475 U.S. 292, 306-07 (1986).

In June 2005, appellants resigned their union membership and objected to paying for various union activities. In so doing, they became part of the roughly nine percent of CSEA employees (approximately 18,700 employees statewide) who are not members of the union but who nonetheless are obligated to pay agency shop fees. The union thereafter sent them annual Agency Shop Notices outlining the union's chargeable and nonchargeable expenses, and quarterly advance rebate checks for the nonchargeable portions of the shop fees.

The notices for 2005-06 and 2006-07 calculated CSEA's chargeable expenses as 78% and 74%, respectively, of full union dues. The notices also indicated that 95% of "organizing" costs were chargeable. The notices described two forms of organizing: (1) organizing within the bargaining unit (e.g., mailing membership brochures to unit members), and (2) organizing non-union workers. As to the second category,[2] CSEA's organizing efforts focus on organizing low-wage private-sector employees who perform work similar to that performed by CSEA-represented employees in the developmental disability, food service, and courier industries. CSEA considers these organizing efforts essential to deterring public-sector employers from privatizing or contracting

---

[2] Only the second group of organizing costs appears to have been litigated below, and so we consider only the chargeability of those costs.

4

out jobs traditionally held by bargaining-unit members, and to prevent the existence of nonunion competition from depressing wages.

The notices also included an audit of CSEA's percentage allocation between chargeable and nonchargeable expenses. The audit notices reveal that approximately 16% of CSEA's annual budget is spent through distribution of funds to locals and regions, and that CSEA applied to that 16% the same percentage rate of chargeable versus nonchargeable expenses applicable to CSEA's other expenses. CSEA defends this allocation on the basis of a presumption that the local affiliates' percentage of chargeable expenses cannot have been lower than the central union's because a high percentage of local affiliates' expenses is chargeable as compared with the expenses of statewide affiliates.

The appellants sued in district court challenging these arrangements and making two principal arguments: (1) compelling them to pay fees to support organizing activities impermissibly burdened their First Amendment rights; and (2) CSEA's use of the local union presumption (in lieu of independently audited spending reports for each local CSEA affiliate) constituted constitutionally inadequate disclosure.

Appellants offered three major contentions why, under the First Amendment, all organizing costs are categorically nonchargeable to nonmember employees. They first claimed that, like political contributions that strengthen a public-sector union, organizing is too removed from a union's core collective bargaining activities to be considered a part of that function. Secondly, they contended that the connection between organizing and collective bargaining is too tenuous to support the inference that one who does not pay for organizing is a free-rider on the union's efforts to

administer the collective agreement. Finally, they contended that because organizing is, at its core, the advocacy of the fundamental ideological commitment to unionism -- i.e., because organizing is the marketing of the union -- charging nonmembers for organizing expenses is an unwarranted burden on First Amendment freedoms. CSEA, in response, took the position that its organizing efforts were merely a natural outgrowth of its chargeable collective bargaining work because it targeted employees whom it needed to unionize in order to deter public-sector employers from privatizing jobs held by bargaining-unit members and from decreasing CSEA-represented employees' wages.

Both parties moved for summary judgment. Applying the test set forth in *Lehnert v. Ferris Faculty Ass'n*, 500 U.S. 507 (1991), the district court concluded that the union's organizing activities did not violate the First Amendment because those organizing activities were "germane to protecting, through collective bargaining, the wages, benefits and working conditions of bargaining unit members." *Scheffer*, No. 05-cv-6700, 2007 WL 2126286, at *13. The court also held that use of the local union presumption met First Amendment standards. It reasoned that absolute precision in calculating nonmember fees was not required; that the presumption employed by CSEA appeared, if anything, to undercharge nonmember employees; and that CSEA had adequate safeguards to ensure that local affiliates' percentages of nonchargeable expenses did not exceed those of statewide affiliates. *Id.* at *15. The district court thus granted summary judgment for CSEA. This appeal followed.[3]

---

[3] Plaintiffs have also appealed the district court's October 24, 2006 order denying their request that their counsel, the National Right to Work Foundation, be appointed as class counsel for a class consisting of all CSEA's dissenting nonmembers statewide. The district court denied the motion because it held that "Foundation counsel are clearly in conflict with the objectives of

6

**DISCUSSION**

We review a grant of summary judgment *de novo* and construe the evidence in the light most favorable to the nonmoving party. *Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir. 1999). We will affirm if the record indicates that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Based on the substantial record before us, we find no issues of material fact that require further development, and conclude that (1) plaintiffs-appellants are entitled to summary judgment with respect to their claim that they cannot be charged for the union's costs of organizing private-sector workers in the developmental disability, food service, and courier industries, and (2) the union is entitled to summary judgment on plaintiffs' claim that the fee-disclosure procedures are unconstitutional.

**I.**

We first consider whether charging nonmember employees for organizing activities under the circumstances presented here is consistent with the First Amendment. The Supreme Court, in *Abood*, held that although agency shops in the public-employment context implicate employees' First Amendment interests in freedom of speech and association, such unions are "constitutionally justified by the legislative assessment of the important contribution of the union shop to the system of labor relations established by Congress." 431 U.S. at 222. The central service a union performs for nonmember employees is to collectively bargain on their behalf. Therefore states may, consistent

plaintiffs and the putative class and cannot act in their best interests." *Scheffer v. Civil Serv. Employees Ass'n, Local 828*, No. 05-cv-6700, Slip. Op. at 15 (W.D.N.Y. Oct. 24, 2006). This conclusion is well grounded in the record. *See id.* at 7-9. Accordingly, the district court did not abuse its discretion in declining to appoint the Foundation as class counsel. *See Parker v. Time Warner Entm't Co.,* 331 F.3d 13, 18 (2d Cir. 2003) ("Generally, a district court's decision regarding class certification is reviewed for abuse of discretion.").

with the First Amendment, "require[ an employee] to help finance the union as a collective-bargaining agent," even if the employee harbors "political objections to unionism itself." *Id*. Otherwise, nonmember employees would be "free-riders" on the union's collective bargaining activities on their behalf. *Lehnert*, 500 U.S. at 520-21.

That an expense is related to collective bargaining is a necessary, but not sufficient, condition for its being chargeable to a dissenting nonmember under the First Amendment. There is a thin line between those limits to a nonmember's speech and association rights that can be justified by the government's legitimate interest in the agency shop, and those that cannot. In *Lehnert*, the Supreme Court set forth a three-part test for evaluating whether union expenses are constitutionally chargeable to dissenting nonmembers of a public-sector union. According to the Court, "chargeable activities must (1) be 'germane' to collective-bargaining activity; (2) be justified by the government's vital policy interest in labor peace and avoiding 'free riders'; and (3) not significantly add to the burdening of free speech that is inherent in the allowance of an agency or union shop." *Lehnert*, 500 U.S. at 519. In order to satisfy *Lehnert*, all three elements of the test must be established. In this case, we hold that although the organizing at issue is germane to collective bargaining, it does not present a free rider problem, and thus is not chargeable under *Lehnert.* We therefore need not consider the issue of whether the organizing activity here significantly adds to the burdening of free speech inherent in the agency shop.[4]

---

[4] As Judge Jacobs explains in his concurrence, he would prefer to decide the case on the alternative ground that when a public-sector union organizes private-sector workers, it categorically imposes an impermissible burden on the free expression of dissenting nonmembers, even if those nonmembers could appropriately be considered "free-riders" on the union's organizing efforts. He would so hold based on his conclusion that such organizing underwrites, in the public sphere, the ideology "that government employment should be augmented and that

8

The district court concluded, as do we, that absent organizing, CSEA would be deprived of an important lever in negotiating on behalf of the employees it already represents, and that organizing within a competitive market is therefore "germane to protecting, through collective bargaining, the wages, benefits, and working conditions of bargaining unit members." *Scheffer*, 2007 WL 2126286, at *13. The record below establishes that CSEA bargaining-unit members in the developmental disability, food service, and courier industries have faced increased threats to their job security, wages, and benefits in recent years due to employers' efforts to contract out their work to non-union, private-sector employees in the same industries, and also that the increasing presence of nonunionized employees has impaired CSEA's ability to achieve wage and benefit gains for bargaining-unit members who work in these industries. Facts undisputed by the parties indicate that public-sector employers in New York have attempted to shift jobs held by CSEA employees in the developmental disability, food service, and courier fields to nonunion employees. For example, private-sector employees in the developmental disability field receive an average of $15,000 less in wages and benefits annually than CSEA labor, and the State has therefore directed growth in that industry towards less expensive nonunion labor. Out of 5,000 beds for people with developmental disabilities funded

---

privatization should be frustrated and prevented." *See* Concurring Op. at 5.

Judge Parker and Judge McLaughlin, on the other hand, believe that such organizing may, in certain circumstances, simply express a commitment to, and embody a strategy for, collective bargaining on behalf of employees, not a commitment to a broader ideological viewpoint about privatization. Thus, in their view, organizing of this nature can be consistent with the First Amendment, as the Supreme Court has made it clear that when a union is acting "to promote the cause which justified bringing the group together, the individual cannot withdraw his financial support merely because he disagrees with the group's strategy." *Abood,* 431 U.S. at 222-23 (internal quotation marks omitted).

Regardless, we need not resolve these differences. The *Lehnert* analysis is highly fact-specific and is applied on a "case-by-case" basis. *Lehnert*, 500 U.S. at 519. Because we find, on the record before us, that there is no free-rider problem, we end our analysis there.

by New York State through the New York Cares program in the last five years, private-sector nonunion employees were responsible for 4,900 of them. The state has also threatened to transfer responsibility for facilities operated by union labor to lower cost private-sector employers, resulting in the loss of those union jobs. Unionized employees in food and courier services in schools have also been threatened because school districts have attempted to replace full-time positions with part-time, nonunionized, lower-wage labor.

CSEA believes that after it initially failed to respond to threats of this nature, its collective bargaining efforts on behalf of the employees it represents significantly suffered. CSEA noted that during collective bargaining negotiations, employers made comparisons between the wages of unionized labor and nonunion labor in order to pressure CSEA to make concessions for lower wages. CSEA has established that the increased presence of private-sector nonunion labor poses a serious threat to its employees' job security, wages, and benefits. These are areas which are at the core of CSEA's collective-bargaining responsibilities, and which CSEA is statutorily required to advocate for on behalf of both members and nonmembers.

CSEA's organizing activities differ from those the Supreme Court found non-chargeable in *Ellis v. Brotherhood of Railway Clerks,* 466 U.S. 435 (1984). In *Ellis*, which was decided prior to the Court's formulation of the *Lehnert* test, the Court considered whether general organizing expenses were chargeable under the Railway Labor Act (RLA), 45 U.S.C. § 152. Conducting an analysis akin to germaneness, *Ellis* concluded that "dues exacted from an objecting employee to recruit members among workers outside the bargaining unit can afford only the most attenuated benefits to collective bargaining on behalf of the dues payer." 466 U.S. at 452. In *Ellis,* however, there was no specific evidence that the organizing at issue afforded anything more than an attenuated benefit to its members.

10

In contrast, because the non-unionized employees that CSEA is organizing are "pa[id] lower wages and provide[d] lesser benefits" than current CSEA employees, CSEA's "prospects of achieving the economic objectives of the members of the bargaining unit" are significantly weakened. *United Food & Commercial Workers Union, Local 1036 v. NLRB*, 307 F.3d 760, 769 (9th Cir. 2002) (en banc) ("*UFCW*"), *cert. denied,* 537 U.S. 1024 (2002) (upholding an NLRB opinion that the cost of organizing a competing employer's workers was germane to collective bargaining). Therefore, CSEA's organizing activities "may be crucial to improving the wages, benefits, and working conditions of employees in the bargaining unit" by reducing "the competition of employers and employees based on labor conditions regarded as substandard." *Id.* at 768-69 (internal quotation marks omitted).[5] Under *Ellis*, chargeable activities include "not only the direct costs of negotiating and administering a collective-bargaining contract and of settling grievances and disputes, but also the expenses of activities or undertakings normally or reasonably employed to implement or effectuate the duties of the union as exclusive representative of the employees in the bargaining unit." 466 U.S. at

---

[5] In *UFCW,* the Ninth Circuit recognized two other factors that further distinguish *Ellis*: (1) the *Ellis* Court's interpretation of the RLA, a federal statute, relied heavily on legislative history, and (2) the RLA was designed to regulate the railroad industry, which, at the time the RLA was enacted, was highly organized and national in scope. 307 F.3d at 770. CSEA, in contrast, is operating as an agency shop under a generally applicable state law, and is conducting its chargeable organizing activities because the lack of organized workers in the low-wage workforce is proving a serious impediment to collective bargaining. *Ellis*'s holding that "organizational efforts were not what Congress aimed to enhance by authorizing the union shop," 466 U.S. at 452, is therefore inapposite. It is also worth noting that some of the challenged charges in *Ellis* related to organizing that extended outside competitive markets to reach employees in entirely different industries. *See UFCW,* 307 F.3d at 770 (citing *Ellis v. Bhd. of Ry. Clerks*, 685 F.2d 1065, 1075 (9th Cir. 1982) (Whelan, *J.*, dissenting)). Although appellants are probation officers as opposed to employees in the developmental disability, food services, and courier fields that CSEA is attempting to organize, they are part of a union that includes such workers.

11

448 (holding that union conventions, social activities, and publications were chargeable so long as they did not relate to political causes). The organizing activities considered in *Ellis* did not rise to that level. Those at issue here, in contrast, do, and therefore they satisfy *Lehnert*'s germaneness prong.

However, the fact that this organizing is germane to CSEA's collective bargaining activities does not resolve the issue of whether *these particular plaintiffs* can properly be charged for it. It is clear to us that as probation officers, they derive little meaningful benefit from the unionization of workers in the developmental disability, food service, and courier industries, and therefore present no free-rider problem by not paying the costs of this organizing.

CSEA's expert witness, labor economist Dr. Dale A. Belman, testified in support of the theory that "higher union density in the public sector contributes to union bargaining power-- the ability of a union to negotiate better wages and benefits for those the union represents." Decl. of Dr. Dale Belman at 9 ("Belman Decl."). As Dr. Belman explained, "[t]he organization of private-sector individuals *who do similar work* as public employees is critical to protecting the earnings (and jobs) of public-sector union members insofar as it serves to eliminate the incentive to privatize union work." *Id.* at 12 (emphasis added). In other words, the union density theory is based on the idea that organizing private-sector workers who compete with public-sector workers will benefit those public-sector workers. This theory depends upon a considerable overlap between the job of the dissenting nonmember and the job of the private-sector worker being organized. Accordingly, Benjamin Gordon, CSEA's Director of Organizing, testified in his declaration that organizing private-sector employees in the developmental disability, food service, and courier industries enhances CSEA's bargaining power and thereby benefits CSEA employees who work, respectively, in the developmental disability, food service, and courier industries. *See* Decl. of Benjamin I. Gordon ¶¶ 8-29 ("Gordon Decl.").

12

The union density theory fails to explain how organizing private-sector workers benefits union-represented public-sector employees who do not compete for jobs with the workers being organized. Here, the union has presented no evidence that probation officers compete for jobs with workers in the developmental disability, food service, and courier industries. Indeed, it is self-evident that probation officers do not do the same work as those who work in the developmental disability, food service, or courier industries. Nor do probation officers compete with people who do those jobs, except to the extent that everybody competes with everybody. Among these four occupations there are marked differences in every consideration that matters for employment: responsibility, education, physical capacity, language skill, training, licensure, hours, wages, work schedules, etc. There is no obvious cross-elasticity of demand between probation officers on the one hand and developmental disability, food service, or courier employees on the other. Therefore, plaintiffs-appellants derive little benefit from the organizing at issue in this case, and there is no free-rider problem to justify charging them for it.[6]

Addressing this argument in the district court, the union emphasized that, under *Lehnert*, "a local bargaining representative may charge objecting employees for their pro rata share of the costs associated with otherwise chargeable activities of its state and national affiliates, even if those activities were not performed for the direct benefit of the objecting employees' bargaining unit" as

---

[6] Appellants did not raise this particular free-rider argument -- that CSEA's efforts to organize private-sector competition in industries other than plaintiffs' provides no benefit to plaintiffs' own bargaining unit -- with the same precision that they did both below and in their reply brief. We are therefore not required to consider this argument. *Thomas v. Roach,* 165 F.3d 137, 145-46 (2d Cir. 1999). Nevertheless, we do so here because the union bears the burden of proving that its expenses are chargeable under *Lehnert*, *Seidemann v. Bowen,* 584 F.3d 104, 111 (2d Cir. 2009), and because the union had an opportunity to litigate the issue below.

13

long as there is "some indication that the payment is for services that may ultimately inure to the benefit of the members of the local union by virtue of their membership in the parent organization." *Lehnert,* 500 U.S. at 524; *see* Def. Reply Br. in Support of Mot. for Summ. J., D. Ct. Doc. No. 58 (filed March 23, 2007), at 8-9. However, there is no indication that plaintiffs' payment for CSEA's organizing of private-sector workers will significantly benefit plaintiffs in the future. For example, the union presented no evidence that it plans to "pool" its organizing expenses in a way that will ultimately inure to the benefit of probation officers. *See Lehnert,* 500 U.S. at 523. Nor is there any evidence that the union eventually plans to organize private-sector workers who compete with the appellants. The closest such evidence in the record is the deposition testimony by plaintiff Joseph Stephany that he has heard "rumors" that Monroe County is considering privatizing some probation department jobs. App'x 1037. There is no evidence, however, that this privatization is imminent or even likely, or that CSEA would attempt to organize private probation officers should they ever exist. Unlike more traditional collective bargaining activities (e.g., contract negotiation), the benefit of which appellants' bargaining unit is likely to receive at some point in the future even if not "in any particular membership year," *Lehnert,* 500 U.S. at 523, CSEA's organization of private-sector workers who compete with appellants is a hypothetical possibility contingent on a series of future events whose likelihood of occurrence has not been demonstrated. Accordingly, plaintiffs-appellants are entitled to summary judgment on their claim that charging them for CSEA's private-sector organizing violates their rights under the First Amendment.

**II.**

The plaintiffs additionally argue that the local union presumption CSEA applies to categorize the 16.6% of its budget that is spent by local unions does not satisfy the standard articulated in

14

*Chicago Teachers Union, Local No. 1 v. Hudson*, 475 U.S. 292 (1986). In *Hudson*, the Supreme Court addressed the constitutionality of procedures by which unions identify chargeable costs and report such costs to nonmember employees. The court cautioned that "[c]arefully tailored" procedures are necessary to (1) minimize constitutional infringement and (2) give a nonmember employee "a fair opportunity to identify the impact of the governmental action on his interests and to assert a meritorious First Amendment claim." *Hudson,* 475 U.S. at 303. The *Hudson* Court emphasized that "[l]eaving the nonunion employees in the dark about the source of the figure for the agency fee -- and requiring them to object in order to receive information -- does not adequately protect the careful distinctions drawn in *Abood*." *Id.* at 306.

To protect against this danger, a union must provide "adequate disclosure" of the "major categories of expenses," verified by an "independent auditor." *Id.* at 307 n.18. "[A]bsolute precision" cannot be expected or required of the disclosures, and as long as the major categories of expenses are included, "an exhaustive and detailed list" of all expenses is not necessary. *Id.* (internal quotation marks omitted). Payments to affiliated organizations must include a showing that the payment is entirely chargeable or must include "an explanation of the share that [i]s [nonchargeable]." *Id. Hudson* also requires the union to provide for a reasonably prompt decision by an impartial decisionmaker in the event of an objection to the calculations in an Agency Shop Notice. *Id.* at 307.

In its annual Agency Shop Notice to nonmembers, CSEA reports the expenditures of its over 1400 regional, local, and unit affiliates as matching that of the statewide union, and thereby effectively "presumes" that the local unions' nonchargeable costs will not exceed those of the statewide union. According to the union, that presumption is based upon the fact that CSEA local unions perform tasks that are overwhelmingly chargeable relative to the statewide union. Local unions, for example, tend

15

to handle grievances, disciplinary matters, labor-management relations, safety and health monitoring, and the like, so the local presumption likely understates the actual chargeable percentage of local expenditures.[7]

The union has pointed to internal procedures designed to ensure that the nonchargeable expenses of local affiliates do not exceed those of CSEA as a whole. The local affiliates' expenditures are limited by (1) the CSEA constitution, which prohibits local expenditures on political or ideological activities; (2) a CSEA Financial Standards Code foreclosing local expenses on political causes; (3) annual notices of CSEA's statewide expenses and instructions to local affiliates that the nonchargeable percentage of local expenditures is not to exceed that of the statewide union; (4) the requirement to demonstrate compliance with that instruction through budget and expenditure reporting prior to the receipt of funds from the statewide union; and (5) CSEA audits on a random basis of local compliance with the nonchargeable percentage limitation.

Appellants assert, however, that the expenditures of each local must be independently audited in order to provide nonmember employees with sufficient information to gauge the propriety of the union's fee. They also contend that CSEA's assumption that the local affiliates abide by CSEA's internal spending restrictions is the "functional equivalent of the fox guarding the henhouse." According to appellants, there is no reason to expect the local unions' expenses to match those of CSEA as a whole, as the locals have their own budgets, presidents, and treasurers.

The district court held that use of a local union presumption is constitutionally permissible.

_____

[7] As CSEA notes, if a higher portion of local affiliates' expenses are chargeable relative to those of statewide affiliates, the local union presumption results in a lower charge to nonmembers than they would receive in the absence of the presumption.

16

Noting that the presumption results in a smaller fee assessment against nonmembers than would otherwise exist, and also that CSEA has taken steps to ensure that the percentage of nonchargeable expenses of local affiliates does not exceed that of statewide and regional offices, the district court concluded that the application of the presumption is reasonable. The district court also noted that our decision in *Price v. UAW, Local 571*, 927 F.2d 88, 93 (2d Cir. 1991), which holds that the local union presumption satisfies the "duty of fair representation" standard under the National Labor Relations Act ("NLRA"), strongly supports a conclusion that the presumption is also appropriate under the First Amendment.

We agree with the district court's assessment. In *Price*, we determined that the local union presumption meets the NLRA's "duty of fair representation," but we also relied upon *Andrews v. Education Ass'n*, 653 F. Supp. 1373 (D. Conn.) (Cabranes, *J.*), *aff'd on other grounds*, 829 F.2d 335 (2d Cir. 1987). In *Andrews,* Judge Cabranes held that the local union presumption is constitutional because *Hudson* does not require absolute precision in the calculation of charges to nonmembers. *Price*, 927 F.2d at 94; *see also Andrews*, 653 F. Supp. at 1377-78.

We now hold that the local union presumption is permissible under *Hudson*. Unlike *Hudson*, where the Union had done nothing more than disclose, without further explanation, that nonmembers were responsible for 95% of the Union's total expenditures, CSEA has followed *Hudson's* instructions that it disclose "the major categories of expenses" (of which the expenses of its locals are one) and that it employ "an independent auditor." *Hudson*, 475 U.S. at 307 & n. 18. Further precision is not required by *Hudson*.[8]

---

[8] *Hudson* does require that local unions provide an explanation of how the share of their payments to "affiliated state and national labor organizations" were used. 475 U.S. at 307 n.18.

"The test of adequacy of the initial explanation to be provided by the union is not whether the information supplied is sufficient to enable the employee to determine in any final sense whether the union's proposed fee is a correct one, but only whether the information is sufficient to enable the employee to decide whether to object." *Dashiell v. Montgomery County*, 925 F.2d 750, 756 (4th Cir. 1991); *see also Cummings v. Connell*, 316 F.3d 886, 895 (9th Cir. 2003) (purpose of *Hudson* notice is to provide nonmember with information necessary to evaluate whether to object to union's calculation of chargeable expenses). Here, therefore, as was the case in *Price,* "any objector need not accept the Union's use of the 'local presumption' but may challenge it in arbitration. In the event of such a challenge the Union bears the burden of proving that the local union's expenditures are chargeable to the degree asserted by the Union." *Price,* 927 F.3d at 94.

We are satisfied that application of the local union presumption provides the information necessary to allow nonmembers to gauge the propriety of the fee and whether or not they should object to it, which is the purpose of the notice. As previously noted, the union has set in place a variety of internal procedures, including provisions in its constitution, its Financial Standards Code notices, and audits, designed to ensure that the chargeable expenses of local affiliates do not dip below that of CSEA as a whole. We conclude that this constellation of procedures meets constitutional standards.

## CONCLUSION

The judgement of the district court is AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.

---

Payments to affiliated state and national labor organizations, however, pose a particular danger of being used for nonchargeable purposes due to the political nature of those organizations. In contrast, and as CSEA has explained, its local divisions are more administrative in nature, and in fact are required to spend *less* on nonchargeable activity than CSEA as a whole does.

18

DENNIS JACOBS, Chief Judge, concurring:

I concur in the Court's opinion. Insofar as it holds that the fee disclosure was adequate (and rules that plaintiffs' counsel should not be appointed as class counsel), I rest upon that opinion entirely. As to the assessment of non-members for union organizing expenses, I concur--with these further observations.

**A**

As the Court's opinion explains, expenses are chargeable only if they pay for activities that are (i) germane to collective bargaining; (ii) advance labor peace and avoid free-rider problems; and (iii) do not significantly add to the burden on First Amendment rights that inheres in the allowance of an agency shop. See Lehnert v. Ferris Faculty Ass'n, 500 U.S. 507, 519 (1991). The Court's opinion decides the case on the second Lehnert consideration--that these plaintiffs are not free-riders-- and holds that, on this record, non-members of the union employed by the State as probation officers may not be assessed for the expense of organizing people in the private sector who work as couriers, or in the food service industry, or with persons having developmental disabilities.

At the same time, the opinion leaves open the possibility that certain additional averments, if made, might (or might not) render the plaintiffs free-riders to some unstated degree or percentage. See Majority Op. at 13-14. The Court's opinion does an admirable job of searching and parsing the present record, and I can hardly deny that additional averments of other facts may affect whether a nonmember of a union may become a free-rider; so I concur.

But I would decide this case on an alternative basis that is simple, obvious, and available. Giving effect to the third Lehnert consideration, I would hold--categorically--that the First Amendment is violated when public-sector unions charge dissenting nonmembers the cost of organizing private-sector employees.

**B**

"To compel employees financially to support their collective-bargaining representative has an impact upon their First Amendment interests." Abood v. Detroit Bd. of Educ., 431 U.S. 209, 222 (1977). Abood considered the First Amendment implications of a public-sector union's use of dissenting nonmembers' compelled fees for several

2

activities, some of them related to collective-bargaining, some not.  The Court held that "insofar as the [challenged] service charges are applied to collective-bargaining, contract administration, and grievance-adjustment purposes," there is no First Amendment violation.  Id. at 232 (relying on International Ass'n of Machinists v. Street, 367 U.S. 740 (1961), and Railway Employees Department v. Hanson, 351 U.S. 225 (1956)).  But the First Amendment *is* violated when a public-sector union requires a dissenting nonmember to pay for "the support of an ideological cause he may oppose." Abood, 431 U.S. at 235.

In Abood, the Court had no occasion to consider the "difficult problems in drawing lines between collective-bargaining activities, for which contributions may be compelled, and ideological activities unrelated to collective bargaining, for which such compulsion is prohibited." Id. at 236.  Such lines were later drawn in Lehnert, which acknowledged that permissible agency shop fees burden the First Amendment rights of dissenting nonmembers to some irreducible degree, but listed three considerations that determine whether that burden exceeds the irreducible (and acceptable) minimum.  See Lehnert, 500

3

U.S. at 518-19; see also Seidemann v. Bowen, 584 F.3d 104, 111 (2d Cir. 2009).  As these three considerations (listed at the beginning of this concurrence) reflect, even activities that assist collective bargaining may nevertheless impose an impermissible burden on expression. On summary judgment, I accept the union-sponsored averment that organizing in the private sector assists collective bargaining on behalf of government workers (however attenuated and counter-intuitive that averment is); at the same time, however, such organizing imposes an impermissible burden on expression.

Lehnert teaches that there is likely to be an impermissible infringement on First Amendment rights when the challenged expenses relate to "expressive and ideological content . . . about which individuals hold strong personal views" and when "the compelled speech is in a public context."  Lenhert, 500 U.S. at 521-22.  All union organizing is conducted by the public expression of views and ideas on which people can--and do--divide; and organizing that aims to expand public employment is especially controversial and divisive.  For that reason, the challenged expenditures cannot be charged to the plaintiffs.

4

**C**

There can be no doubt that organizing expenses underwrite expressive and ideological content--here, that government employment should be augmented and that privatization should be frustrated and prevented.  CSEA does not disagree.  CSEA's Director of Organizing defends the chargeability of organizing expenses on the express ground that they help "maintain the wages, benefits and working conditions for CSEA's membership and . . . stem the loss of jobs [to workers in the private sector] for members of CSEA's bargaining unit."  Decl. of Benjamin I. Gordon ¶ 29; see also id. ¶ 39 ("In sum, a major focus of CSEA's organizing efforts is to stem the loss of jobs of employees represented by CSEA and to protect the wages and benefits of those employees from declining due to the presence of unorganized and lesser paid employees in the private sector.").  And in this appeal, CSEA affirmatively argues that its "organizing efforts [are] essential to deter public-sector employers from privatizing or contracting out the jobs of bargaining-unit members."  Appellees' Br. at 7.  But the more CSEA contends that the expenditures at issue are made to defeat privatization and promote government

5

employment, the more CSEA reinforces the conclusion that such organizing is a quintessentially political act: "[D]ecisionmaking by a public employer is above all a political process."  Abood, 431 U.S. at 228.

At the risk of being obvious, there is intense political controversy over privatization: what services the government should provide; whether and how much those services should expand; and which of those services should be contracted out.[1]  Few political issues are so consequential, divisive, and heated.  On such matters, "worker and union cannot be said to speak with one voice."  Lehnert, 500 U.S. at 521.  Government employees are also citizens, ratepayers, property owners, and members of families.  Families with one member working for the

---

[1] The Supreme Court has long acknowledged the lively debates over unionism, especially in the public sector. See, e.g., Abood, 431 U.S. at 229 ("The distinctive nature of public-sector bargaining has led to widespread discussion about the extent to which the law governing labor relations in the private sector provides an appropriate model."); id. at 225 n.20; Hanson, 351 U.S. at 233-34 ("Powerful arguments have been made here that the longrun interests of labor would be better served by the development of democratic traditions in trade unionism without the coercive element of the union or the closed shop.  Mr. Justice Brandeis . . . wrote forcefully against the closed shop."); id. at 235 ("To require, rather than to induce, the beneficiaries of trade unionism to contribute to its costs may not be the wisest course.").

government may include others working in the private sector. The union-sponsored affidavits argue that organizing the private sector reduces competition with government workers--although this seems to be a futile project.[2]  In any event, courts should not presume that such a union goal trumps the First Amendment right to agitate for reform, austerity, and economy in government.

Finally, union organizational activity necessarily takes place in public--outside the union, outside the unionized workplace, and outside the halls and lobbies of the legislature.  In that public context, the CSEA makes one argument to which all others are subsidiary: that union membership confers net benefits--a political and ideological perspective that is not obviously shared by dissenting workers in a union shop.

These considerations compel the conclusion that organizing activities "significantly add to the burdening of free speech that is inherent in the allowance of an agency

---

[2] Protecting government work by organizing the private sector is like trying to insulate one's home by heating the backyard.  And since zoo-keepers are in the same bargaining unit as the probation officers, the causation principle becomes particularly zany in this case.  Perhaps it is thought that food-service workers in the private sector compete for jobs with public-zoo workers who feed the seals.

7

or union shop." Lehnert, 500 U.S. at 519. Accordingly, and consistent with the First Amendment, public-sector unions should never be allowed to charge dissenting non-members the cost of organizing private-sector employees.

"Political speech must prevail against laws that would suppress it," because "[t]he First Amendment confirms the freedom to think for ourselves." Citizens United v. Federal Election Commission, 130 S. Ct. 876, 898, 908 (2010). The right at issue in Citizens United was the right to engage in political speech. The obverse right--the right *not* to engage in political speech--commands the same level of protection. See Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal., 475 U.S. 1, 11 (1986) ("[A]ll speech inherently involves choices of what to say and what to leave unsaid . . . . The essential thrust of the First Amendment is to prohibit improper restraints on the voluntary public expression of ideas. . . . There is necessarily . . . a concomitant freedom not to speak publicly, one which serves the same ultimate end as freedom of speech in its affirmative aspect." (internal quotation marks and emphases omitted)). Plaintiffs here have a right to be free from assessments used to promote views on public subjects--views

8

that they do not choose to express, or affirmatively reject.

That is the basis on which I would decide this case.